

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWENTIETH CENTURY FOX FILM CORPORATION, et al., | CV 98-7189 FMC (Ex) |
| Plaintiff(s), | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| DASTAR CORPORATION, et al., | |
| Defendant(s). | |

This case having come on for trial before the Court on August 9, 10, and 11, 2000, and the Court having heard the evidence, considered the briefs and arguments of counsel, and observed the demeanor of the witnesses, does hereby make, pursuant to Fed.R.Civ.P. 52 and Central District Local Rule 14.3, the following Findings of Fact and Conclusions of Law:

## I.    FINDINGS OF FACT

### A.    The Parties

1.    Plaintiff Twentieth Century Century Fox Film Corporation ("Fox") is a Delaware

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

corporation having offices and a principal place of business in Los Angeles, California.

2.      Plaintiff SFM Entertainment LLC ("SFM") is a Delaware limited liability company having offices and a principal place of business in New York, New York.

3.      Plaintiff New Line Home Video, Inc. ("New Line") is a New York corporation having offices and a principal place of business in New York, New York.

4.      Defendant Dastar Corp. ("Dastar") is an Oregon corporation with its principal place of business located in Eugene, Oregon.

5.      Defendant Marathon Music & Video is an Oregon corporation with its principal place of business located in Eugene, Oregon.

6.      Defendant Entertainment Distributing is an Oregon corporation with its principal place of business located in Eugene, Oregon.

**B.      The Book**

7.      Gen. Eisenhower was appointed commander of U.S. troops in Europe during World War II (the "War") and later became Supreme Commander of the Allied Expeditionary Forces.  (Ex. 86.)[1]

8.      As a result of his leadership roles, Gen. Eisenhower's perceptions and views of the War were of unique historic importance.  (January 6, 2000 Court Order Granting Summary Judgment ("January 6 Order") at 13; Ex. 72.)

---

[1] All citations to exhibits refer to plaintiffs' designated trial exhibits unless otherwise noted.

2

9.      With the help of William Robinson, Vice President of *The New York Herald Tribune* ("*The Tribune*") (which wanted to serialize excerpts of Gen. Eisenhower's memoirs), Douglas Black, President of Doubleday and friend to Gen. Eisenhower, persuaded Gen. Eisenhower to write memoirs of his War experiences for Doubleday.  (January 6 Order at 13.)

10.     Doubleday published the Book on November 22, 1948.  Thirty excerpts from the Book were published on consecutive days in *The Tribune*, the first appearing on November 7, 1948.  (January 6 Order at 15.)

11.     Gen. Eisenhower was pleased with the Book, which was both a critical and commercial success.  (Exs. 71, 72.)

12.     In 1948, Doubleday obtained certificates of registration for the copyrights to the Book and *The Tribune* excerpts.  Doubleday timely renewed those copyrights in 1975 as the "proprietor of copyright in a work made for hire."  (January 6 Order at 15; Ex. 52.)

**C.      The *Crusade* Series**

13.     By agreement dated November 20, 1948, Doubleday granted to Twentieth Century Fox Television Productions, Inc. (The "Fox Division") the sole and exclusive television rights in the Book.  (January 6 Order at 15; Ex. 73.)

14.     In the late 1940s, Peter Levathes, Vice President of Twentieth Century Fox Film Corporation ("Fox"), arranged for and oversaw production of the *Crusade* Series.  Levathes, on behalf of the Fox Division, negotiated an agreement (the

"Fox/Time agreement") with Time, Incorporated's *March of Time* news unit ("Time")
to produce the *Crusade* Series.  (January 6 Order at 15; Ex. 74.)

15.    The Fox/Time agreement provides that the *Crusade* Series must be
based upon or illustrating the work entitled "CRUSADE IN EUROPE" by Dwight E.
Eisenhower.  (January 6 Order at 15; Ex. 74.)

16.    The Fox/Time agreement gave the Fox Division and Doubleday the
right to review the script and film for individual episodes and Time agreed to
eliminate any portion of the script and any original photography that was determined
to adversely affect Gen. Eisenhower's reputation.  (Ex. 74.)

17.    Creating the *Crusade* Series was a major project that involved not only
developing scripts for more than two dozen separate one-half hour episodes, but
also selecting and assembling footage, preparing connecting materials, doing a
narration, and deciding on and incorporating music.  (January 6 Order at 13.)

18.    The *Crusade* Series was very closely based on and illustrated the
Book.  (Exs. 86, 87.)

19.    The *Crusade* Series followed the Book's structure, format and content.
(Exs. 86, 87.)

20.    The *Crusade* Series conveyed Gen. Eisenbower's perspective on the
War, as articulated in the Book.  (Exs. 86, 87.)

**D.    The *Crusade* Videos**

21.    Fox reacquired the television rights in the Book from Doubleday for a

4

period of seven years through a June 22, 1988 agreement (the "1988 agreement.")
(Ex. 76.)

22.    When Fox reacquired the television rights in the Book pursuant to the
1988 agreement, Fox also acquired the exclusive right to distribute the *Crusade*
Series on video, and to license and sublicense others to do the same.  (Ex. 76.)

23.    On March 11, 1993, the 1988 agreement was amended to extend the
term of Fox's exclusive license to fourteen years.  This amendment was recorded
with the U.S. Copyright Office on February 13, 1996.  (Ex. 77.)

24.    By agreement dated June 22, 1988 (the "Fox/SFM agreement"), Fox
granted to SFM Entertainment LLC ("SFM") for a period of seven years the right to
act as its exclusive sales agent and distributor of the *Crusade* Series in all media,
including video, and to license and sublicense any parties to do the same.  The term
of the Fox/SFM agreement, which was recorded with the U.S. Copyright Office on
February 13, 1996, was automatically extended to fourteen years upon the March
11, 1993 amendment of the 1988 agreement.  (January 6 Order at 17; Exs. 78, 79.)

25.    By agreement dated July 27, 1984 (hereinafter the "SFM/New Line
agreement"), which was amended on October 27, 1986, May 12, 1987, and
December 15, 1991, SFM granted to Embassy Home Entertainment ("EHE"), and
thus to New Line Home Video, Inc. ("New Line"), as EHE's successor in interest, an
exclusive license to distribute the *Crusade* Series on video.  (January 6 Order at 16;
Ex. 81.)

26.    In 1980, SFM entered into an agreement with Time-Life Television, a division of Time-Life Films Inc., to purchase its *March of Time* library, which was to have included the *Crusade* Series.  (Ex. 75.)

27.    After an extensive search, SFM located and purchased the tapes and began restoring the *Crusade* Series so it could be repackaged for distribution on video.  (January 6 Order at 16.)

28.    SFM's total cost to restore the *Crusade* Series was approximately $75,000.  (January 6 Order at 16.)

29.    In conjunction with New Line, SFM had the tapes repackaged as videos (the *Crusade* Videos).  The *Crusade* Videos were a direct reproduction of the *Crusade* Series.  (January 6 Order at 16; Ex. 81.)

30.    The credits for the *Crusade* Videos listed the actual creators of the *Crusade* Series and the *Crusade* Videos.  For instance, credit is given to "New Line Home Video," "A March of Time Production By Arrangement with 20th Century Fox," "Eisenhower's Crusade in Europe Based on the Book by Dwight D. Eisenhower" and "SFM."  (January 6 Order at 16; Ex. 7.)

31.    Pursuant to the 1988 agreement, as well as the Fox/SFM and SFM/New Line agreements, New Line distributed the *Crusade* Videos as a six-part series under the title *Crusade in Europe.*  (Exs. 76, 77, 79, 81.)

32.    Each *Crusade in Europe* video bears the following notice: "The Exclusive Picturization of General Dwight D. Eisenhower's book CRUSADE IN

6

EUROPE published by Doubleday & Company Inc. © 1948 Doubleday& Company Inc." (Ex. 3.)

**E.**  **Defendants' Copying of the Book and Bodily Appropriation of the** ***Crusade*** **Series**

33.    Dastar first began producing videos in 1995.  (January 6 Order at 17.)

34.    In April 1995, Lanny Tarter, who became Dastar's director of video acquisitions in September 1995, and Norman Andersen, Dastar's President, spoke about expanding Dastar's product line, which had been exclusively music CDs, into video.  (January 6 Order at 17.)

35.    In looking for a first project to release on video, Tarter and Andersen spoke about the *Crusade* Series, which they both remembered watching as children.

36.    Tarter and Andersen thought a video using the *Crusade* Series would sell well because Tarter has previously produced various successful war videos and 1995 marked the 50th anniversary of the end of World War II.

37.    The first video that Dastar produced was *Campaigns*.

38.    As Dastar's director of video acquisitions, Tarter was generally in charge of acquiring and producing Dastar's video product.  (January 6 Order at 17.)

39.    To create *Campaigns*, Tarter purchased eight beta cam tapes of the *Crusade* Series of sufficient quality so as to be able to reproduce them *en masse*. (January 6 Order at 17.)

7

40.    To make *Campaigns*, Tarter copied the entire *Crusade* Series, making only the following changes: (a) with the assistance of a studio called L.A. Videograms, Tarter substituted a new opening title sequence, credit page and final closing for those in the *Crusade* Series; (b) Tarter substituted 26 new chapter-title sequences that corresponded precisely to the original 26 chapter-title sequences of the *Crusade* Series and subsequent videos; (c) Tarter deleted references to the Book, including images of the Book that appeared at the beginning of each of the 26 chapters of the *Crusade* Series; (d) Tarter moved the *Crusade* "recap" to the beginning of *Campaigns*, and retitled it as a "preview; and (e) inserted narrated chapter introductions written by Tarter.  Tarter did not remove or alter any other aspect of the *Crusade* Series in making *Campaigns*.  (January 6 Order at 17.)

41.    The footage from the *Crusade* Series that was copied to create *Campaigns* contains the original narration from the *Crusade* Series that was taken from the Book.  (Exs. 3, 4, 86, 87.)

42.    With the exception of the opening title sequence, chapter-heading sequences, credit page, and final closing of *Campaigns*, the entire seven hours of *Campaigns* is taken from the *Crusade* Series.  (January 6 Order at 17; Exs. 3, 4, 86, 87.)

43.    *Campaigns* was released in October 1995.  (Ex. 10.)

44.    *Campaigns* contains text from the Book.  There are 853 sentences (including both complete sentences and parts of sentences) in the Book that appear

in *Campaigns*; 244 pages of the Book, or 51.2% (out of a total of 477 pages of the Book), contain text directly copied or very closely paraphrased in *Campaigns*; 2,211 lines of text in the Book, or 11.6% (out of a total of approximately 19,000 lines of text in the Book) contain text directly copied or very closely paraphrased in *Campaigns*. (January 6 Order at 18.)

45.    The text in *Campaigns* copied from the Book consists of Gen. Eisenhower's own thoughts and expressions about the War, and not merely historical facts.  (January 6 Order at 18.)

46.    The Book and *Campaigns* follow the same structure, format, content, sequencing, and tone.  (January 6 Order at 18; Exs. 50, 86.)

47.    Both the Book and *Campaigns* are organized around the same six subjects:  (1) the build-up of United States armed forces before World War II and the entry of the U.S. into the War; (2) the Allied campaign in North Africa; (3) the Allied campaign in Italy; (4) the Allied campaigns in France and Germany leading to victory in Europe; (5) the involvement of Russia in the War in Europe; and (6) the post-War period.  (January 6 Order at 17-18.)

48.    The Book, which is not simply a chronological history of the War, moves back and forth in time as it addresses different Allied operations, different battles, selected historical figures known to Gen. Eisenhower, and other events and subjects.  (Ex. 86.)

49.    Following the Book's format, *Campaigns* also moves back and forth in

time between events and subjects and is not a purely chronological account of the War.  (January 6 Order at 18; Exs. 50, 86.)

50.    The Book tells of Gen. Eisenhower's personal and unique story of World War II and is organized around his personal experiences and perspectives, the issues and decisions he faced, and the persons with whom he had contact or whom he believed had a profound influence on events. (January 6 Order at 18; Ex. 86.)

51.    Although truncated, *Campaigns* repeats Gen. Eisenhower's personal story, following the Book's circuitous route and adopting the same tone.  (January 6 Order at 18.)

52.    The sequencing of the topics in the Book is roughly the same as that in *Campaigns*; many of the same topics are juxtaposed and recounted in the same order, and the overall presentation of the War is the same as in the *Crusade* Series and the Book.  (January 6 Order at 18.)

53.    While the Book depicts many famous moments of the War such as the D-Day Invasion, the Book also depicts less well known events that Gen. Eisenhower decided to include.  Such less conspicuous events described in the Book are, however, reproduced in *Campaigns*, both in the narration <u>and</u> in the War footage selected to illustrate it.  As examples, the Books tells the story of the construction of "Mulberry" harbors off the coast of France and the destruction of one of those harbors in a hurricane; the Book discusses the training of the U.S. troops, and Gen.

Eisenhower focuses on certain troop maneuvers that were held in Louisiana in September 1941; the Book touches on such less notable events as the death of Admiral Darlen, a French officer who was involved in conflicts in North Africa. Although presenting the War through visuals, *Campaigns* relies on all these same topics — the "Mulberry" harbors, the Louisiana troop maneuvers in 1941, and Admiral Darlen's death — and on many other less prominent topics discussed in the Book. (Exs. 50, 86.)

54.    In addition to the voluminous copying of much of the literal text of the Book in *Campaigns*, the visual images that are shown in *Campaigns* similarly mirror the structure and organization of Gen. Eisenhower's Book and the aspects of the War he chose to discuss and emphasize. (Exs. 3, 4, 86.)

55.    Volume 7 of *Campaigns* is entitled "Eisenhower's Thoughts." Defendants feature this title on the packaging for *Campaigns*. (Ex. 4.)

56.    In early 1996, Dastar released a slightly-revised version of *Campaigns*, in which the only change in content was the addition of 2 to 3 minute "wrap-around" segments that appear at the beginning of each tape and are narrated by Oregon radio personality Dale Reed. (Exs. 4, 23.)

**F.    The Willfullness of Defendants' Copyright Infringement**

57.    At the time they originally saw the *Crusade* Series and in 1995 when they decided to copy it, both Tarter and Andersen were aware that the Series was based on the Book.

58.    Neither Tarter nor Andersen conducted an investigation concerning the copyright status of the Book in 1995, or at any other time prior to the commencement of this litigation. Dastar gave no consideration to whether the Book was in the public domain prior to the release of *Campaigns* in October 1995.

59.    No one at Dastar consulted with a lawyer at any time prior to the filing of this lawsuit to determine whether the release of *Campaigns* would infringe anyone's rights.

60.    Sometime after July 15, 1997, Marathon received a letter from plaintiffs requesting, among other things, that Marathon (1) immediately cease and desist from distributing *Campaigns*, (2) surrender all copies of *Campaigns* and account for all of its sales; and (3) inform plaintiffs of the means by which Marathon obtained copies of the materials used in *Campaigns*. (Ex. 32.)

61.    Marathon did not comply with plaintiffs' cease and desist requests, nor did it consult with an attorney concerning the contents of plaintiffs' July 15, 1997 letter (even though it later stated to plaintiffs that it was consulting with its (non-existent) legal department.)

62.    On July 29, 1997, EDI (d.b.a. of Dastar) sent a letter responding to plaintiffs July 15, 1997 letter, in which defendants requested that plaintiffs "provide [them] with the appropriate documentation in support of [their] assertion to be the exclusive distributors of the *Crusade in Europe* videos." (Ex. 33.)

63.    On approximately September 17, 1997, plaintiff New Line sent a letter

12

responding to EDI's July 29, 1997 letter, in which New Line stated that it was compiling the requested documentation, and reiterated plaintiffs' request that EDI provide plaintiffs with information concerning the source of the materials used to create *Campaigns*.  (Ex. 35.)

64.    On December 18, 1997, plaintiffs sent defendants the documentation requested in EDI's July 29, 1997 letter, establishing plaintiffs' chain of title to the *Crusade* Series and Videos.  EDI did not consult with an attorney or respond to plaintiffs' December 18, 1997 letter.  In fact, Dastar never consulted with an attorney about whether its distribution of *Campaigns* infringed plaintiffs' or anyone else's rights until after the commencement of this litigation.  (Ex. 36.)

65.    EDI did not provide plaintiffs with the information that plaintiff New Line requested in its September 17, 1997 letter to EDI.

66.    Defendants also never made any effort to recall *Campaigns* — even after this lawsuit was commenced.

67.    Around the time plaintiffs filed this lawsuit, Dastar asked Eric Kulberg of Universal Media Inc. to perform a copyright search on the Book.  (Ex. 37.)

68.    In a September 22, 1998 letter to Tarter, Kulberg reported that "[i]t appears that Doubleday & Company has a solid copyright on [the book *Crusade in Europe*] and will hold it at least until 2023."  While Kulberg noted that Fox did not renew the *Crusade* Series' copyrights, he concluded that "the underlying literary rights appear to be intact."  (Ex. 37.)

69.    Dastar continued to sell *Campaigns* after receiving Kulberg's September 22, 1999 letter, and manufactured new copies of *Campaigns* at least as recently as March of 1999 (if not later). At least as recently as July 2000, Dastar was still shipping *Campaigns.* (Exs. 59, 61.)

## G.    The Willfulness of Defendants' Reverse Passing Off

70.    The credits for *Campaigns* identify Andersen as executive producer, Barbara Kaye (Tarter's former assistant) as associate producer, and Tarter as producer. (January 6 Order at 17.)

71.    Dastar purposefully and intentionally deleted all references to the fact that *Campaigns* was based on the Book and all of the images of the Book that appeared in the *Crusade* Series. Dastar also failed to include in *Campaigns* any of the other credits that appeared in the *Crusade* Series. In fact, Dastar deleted these images and omitted the *Crusade* credits to give the impression that *Campaigns* was an original work. (Ex. 3, 4, 86.)

72.    There are no credits in the *Campaigns* Series that would inform viewers that it was taken from the *Crusades* Series. (Ex. 4.)

73.    There is nothing on the packaging for *Campaigns* that states that it is based on the Book or gives credit to any of the plaintiffs concerning the content of *Campaigns*; the only entities defendants give credit to are Dastar and Marathon Music & Video — i.e., themselves. (Ex. 4.)

74.    Dastar placed a "Contains Film Footage from the Previously Released

14

*Crusade in Europe*" label on packaging of only a limited number of boxes of *Campaigns*. (Exs. 4, 26.)

75.    Prior to the release of *Campaigns*, defendants had access to and used a book that identified Fox's association with the *Crusade* Series. (Ex. 41.)

76.    In response to a January 1999 request by defendants, Original Filmvideo Library ("OFL") provided defendants with information related to the production and distribution of the *Crusade* Series, including a full list of credits. (Ex. 40.)

77.    Defendants never made any effort to recall *Campaigns* — even after this lawsuit was commenced.

## H.    Defendants' Illicit Gains from Their Infringement of Plaintiff's Intellectual Property Rights

78.    Dastar sells its videos to warehouse clubs, mail-order companies and retailers, including Sam's Club, Costco, Best Buy, BJ's Wholesale Club, Day Market, Publishers Clearinghouse, Avon, Time-Life, Discovery, and River Town. (Exs. 10, 11.)

79.    Dastar sells *Campaigns* for approximately $25 per boxed set of videos. Plaintiffs sell the *Crusade* videos at a substantially greater price.

80.    *Campaigns* was one of Dastar's best-selling titles. From October 1, 1995, through July 31, 2000, Dastar sold approximately 35,566 units of *Campaigns*, which generated at least $874,851.18 in gross revenues. (Ex. 61.)

15

81.    Defendants' documented costs for producing and distributing *Campaigns* over the same period of time total $91,244.35, as set forth below:

| Documented Cost | Amount |
| --- | --- |
| Cost of the 8 beta cam tapes of *Crusade* Series (Ex. 5) | $ 6,292.00 |
| Charges to delete images of the Book and create new chapter, credit and title sequences (Ex. 14) | 4,321.25 |
| Package Design for *Campaigns* (Ex. 20) | 3,814.75 |
| Salary paid to Dale Reed for narrating wrap-around segments at the beginning of each cassette | 95.00 |
| Rental fee for equipment used to film Dale Reed wrap-around segments (Ex. 25) | 1,460.75 |
| Cost of duplicating cassettes of *Campaigns* documented by invoices produced before the end of discovery (Exs.  62, and 63) | 20,052.75 |
| Manufacturing cost for outer boxes holding seven volume *Campaigns* series, documented by invoices produced before the end of discovery (Exs. 21, 62, 63) | 4,917.13 |
| Manufacturing cost for the sleeves that encase each cassette, documented by invoices produced before the end of discovery (Exs. 21, 62, and 63) | 5,759.75 |
| Cost of 5,000 labels that state "Contains Film Footage from the Previously Released *Crusade in Europe*" (Ex. 27) | 158.50 |
| Freight charges to ship *Campaigns* from duplicator to Dastar, documented by invoices produced before the end of discovery (Exs. 62, 63) | 629.92 |
| 5% Sales Commission | 43,742.55 |
| Total Deductible Costs | $ 91,244.35 |

16

82.   Gross revenue from sales of *Campaigns*          $ 874,851.18

Less deductible costs                                      91,244.35

Net Revenue from Sales of *Campaigns*                $ 783,606.83

83.   Dastar's total gross revenues for the fiscal year ending September 30, 1998 were approximately $25 million. Dastar's total gross revenues for the fiscal year ending September 30, 1999 were $25 million.

84.   Dastar's profits for the fiscal year ending September 30, 1998 were approximately $5 million.  Dastar's profits for the fiscal year ending September 30, 1999 were $4 million.

85.   Dastar's net assets are approximately $10,000,000.

## II.   CONCLUSIONS OF LAW

### A.   Procedure

1.   This Court has subject matter jurisdiction over plaintiffs' federal copyright and Lanham Act infringement claims pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(a) and (b), and over plaintiffs' state law claim for unfair competition based on principles of pendent jurisdiction.  This Court also has subject matter jurisdiction pursuant  to 28 U.S.C. § 1332(a), in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

2.   Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1400(a).

3.    In its January 6, 2000 Order granting plaintiffs' motion for summary judgment (the "January 6 Order"), this Court held that: (1) by copying the *Crusade* Series and selling it under the title *Campaigns in Europe* ("*Campaigns*"), defendants violated the copyright of the underlying Book and infringed plaintiffs' exclusive right to reproduce and distribute videos based upon the Book, and (2) by bodily appropriating the *Crusade* Series and falsely identifying themselves as producers of *Campaigns*, defendants engaged in "reverse passing off" in violation of the Lanham Act and California unfair competition law.  This bench trial was held to determine the appropriate remedies for defendants' infringement of plaintiffs' intellectual property rights.

4.    In the January 6, 2000 Order, this Court also dismissed defendant Dastar Corp.'s counterclaims for unfair competition and declaratory relief.  On July 6, 1999, prior to the transfer of the case to this Court, Judge Tevrizian dismissed Dastar's counterclaims for intentional misrepresentation, negligent misrepresentation, and slander of title.

**B.    Monetary Remedies**

**Copyright Infringement**

5.    Because defendants' infringing actions took place after January 1, 1978, any award of damages under the Copyright Act is controlled by the Copyright Act of 1976; 17 U.S.C. § 301(a); *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984).

18

6.    Under the Copyright Act of 1976, plaintiffs are entitled to recover the actual damages they suffered, as well as any profits resulting from defendants' infringement.  17 U.S.C. § 504(b).

7.    Although plaintiffs do not own the copyright to the Book, they have the right to recover damages for copyright infringement as the exclusive licensee and sublicensees under Doubleday's copyright in the Book.  17 U.S.C. § 501(b); January 6 Order at 2 n.1.

8.    Because plaintiffs bargained for the exclusive right to reproduce and distribute television programs in the video format that are based upon the Book, defendants' sale of *Campaigns* destroyed that exclusivity and thus diminished the value of plaintiffs' licenses, causing plaintiffs actual damage.  *Nintendo of America, Inc. v. Dragon Pacific International*, 40 F.3d 1007, 1110 (9th Cir. 1994), *cert. denied*, 515 U.S. 1107 (1995); *Frank Music Corp. V. MGM*, 772 F.2d 505, 512 (9th Cir. 1985).  Plaitiffs are therefore entitled to an award of actual damages.

9.    With respect to the recovery of defendants' profits, plaintiffs are required to present proof only of defendants' gross revenue.  17 U.S.C. § 504(b).  In this case, defendants generated $874,851.18 in gross revenues from the sale of *Campaigns*.

10.    Defendants have the burden to prove their deductible expenses and any elements of their profits attributable to factors other than the copyrighted work.  *Id.*; *Frank Music*, 772 F.2d at 514.  Any doubt as to the correctness of the profit

19

calculation should be resolved in favor of plaintiffs. *Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876, 881 (9th Cir.), *cert. denied*, 506 U.S. 1001 (1992), *abrogated on other grounds*, 179 F.3d 683 (9th Cir. 1989).

11.    Since defendants were prohibited from relying on documents at trial that they did not disclose before the end of discovery, (*see* Tentative Court Order on Plaintiffs Motion in Limine No. 1 at Pretrial Conference on July 24, 2000; Fed.R.Civ.P. 37(c)), their total proved costs were $91,244.35, as set forth above.

12.    Defendants did not produce sufficient evidence before the close of discovery of, and therefore failed to prove, their entitlement to certain additional claimed costs and expenses.  Therefore, no additional claimed expenses shall be deducted from defendants' gross revenue for purposes of determining defendants' profits.

13.    Defendants also did not prove that any elements of their profits were attributable to factors other than the copyrighted work. Specifically, as this Court has already found, *Campaigns* not only incorporates the literal text from the Book in its narration, but also adopts the Book's structure, format, sequencing, organization, and tone.  In addition to the voluminous copying of the text of the Book in *Campaigns*, the visual images shown in *Campaigns* mirror the many choices Gen. Eisenhower made in organizing his Book and deciding what aspects of his War experience to emphasize and how.  The amount of defendants' profits attributable to factors other than the Book therefore is *de minimus*, if anything at all.  *See Frank*

*Music Corp. v. MGM*, 886 F.2d 1545, 1549 (9th Cir. 1989), *cert. denied*, 494 U.S. 1017 (1990); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 508 F.Supp. 798, 801-02 (S.D.N.Y.).   Because apportionment is improper, plaintiffs are entitled to $783,606.83 as defendants' profits.

14.     Plaintiffs may, at any time before final judgment is rendered, elect to recover statutory damages in lieu of actual damages and profits.   17 U.S.C. § 504(c).  Plaintiffs may elect such statutory damages whether or not there is any evidence of the actual damages suffered by plaintiffs or of the profits reaped by defendants. *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984).

15.     In light of defendants' willful infringement of plaintiffs' exclusive rights in the Book, plaintiffs are entitled to an award of the maximum amount of $150,000 in statutory damages should plaintiffs choose that remedy in lieu of actual damages and defendants' profits.   *See* 17 U.S.C. § 504(c)(2); *Peer International Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1337 (9th Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991).

16.     Defendants were willful infringers because they distributed *Campaigns* with, at the very least, a willful disregard for plaintiffs' rights.   *See A&m Records, Inc. v. Abdallah*, 948 F.Supp. 1449, 1457 (C.D. Cal. 1996); *Sega Enterprises v. Maphia*, 948 F.Supp. 923, 936 (N.D. Cal. 1996).   While defendants contend that their infringement was innocent because they purportedly believed the *Crusade* Series was in the public domain, the evidence shows that defendants did not conduct an

investigation concerning the copyright status of the Book at any time prior to this litigation, even though they were aware when they decided to copy the *Crusade* Series that the Series was based on the Book. Defendants also did not consult with a lawyer to determine whether the release of *Campaigns* would infringe anyone's rights — although they falsely represented to plaintiffs that they had. *See International Star Class Yacht Racing Assoc. v. Tommy Hilfiger*, 80 F.3d 749, 753-54 (2d Cir. 1996). When plaintiffs pointed out defendants' infringement in two 1997 "cease and desist" letters, one of which specifically referred to the Book's copyright and attached copies of the applicable registrations, defendants still did not investigate the Book's copyright status, nor did they cease selling *Campaigns*. In fact, they continued to sell *Campaigns* long after this lawsuit was commenced, even after their own copyright researcher informed them in writing on September 22, 1998, that the underlying intellectual property rights to *Crusade* were "solid" and "intact" and would continue to be "at least until 2023." *See International Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 380-81 (7th Cir. 1988); *O'Brien International, Inc. v. Mitch*, 209 U.S.P.Q. 212, 221 (N.D. Cal. 1980).

**Lanham Act Infringment**

17.    Plaintiffs may recover damages and profits under the Lanham Act, together with statutory damages under the Copyright Act (should they elect statutory damages under the Copyright Act). *Nintendo*, 40 F.3d at 1011.

18.    As actual damages caused by defendants' "reverse passing off,"

plaintiffs are entitled to the lost advertising value of plaintiffs' names and of the goodwill that they otherwise would have gained from public knowledge that plaintiffs were the true source of the misappropriated material in *Campaigns*. *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir. 1981). Specifically, each plaintiff contributed to the creation or distribution of the *Crusade* Videos. Fox conceived of the original *Crusade* Series in the late 1940's, contracted with Doubleday for rights to the Book and with Time to produce the Series, financed the production of the 26 episodes, and participated in the creative process. SFM originated the idea of restoring the *Crusades* Series, spearheaded the effort to find the films, and financed and supervised the restoration and repackaging process. New Line, as distributor, brought the *Crusade* Series into modern homes. Each plaintiff would therefore benefit in its business from being associated with and viewed as responsible for the misappropriated work. Each plaintiff lost valuable goodwill when a purchaser of *Campaigns* was led to believe by defendants' false attribution that it was produced by defendants (rather than plaintiffs). In addition, as a virtual duplicate of the *Crusade* Videos, *Campaigns* appeals to the same audience as the *Crusade* Videos, but at a much lower price. Defendants' reverse passing off therefore not only cost plaintiffs valuable goodwill, but also sales. Accordingly, plaintiffs are entitled to actual damages under the Lanham Act.

19.    Plaintiffs also are entitled to defendants' profits under the equitable theory of unjust enrichment based on defendants' willful Lanham Act infringement.

23

*Lindy Pen Company, Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.), *cert. denied*, 510 U.S. 815 (1993). Defendants' conduct was willful for purposes of the Lanham Act in that, even though defendants knew that the work they misappropriated was created by someone else, they still took credit for themselves. Furthermore, defendants could have easily discovered who was responsible for the *Crusade* Series with even a minimal amount of effort. Prior to *Campaigns*' release, defendants had access to and used a book that identified Fox's association with the work. In addition, defendants were able to obtain a full list of the credits in January 1999. They could and should have done so prior to releasing *Campaigns* in 1995. Finally, defendants continued to sell *Campaigns* even after obtaining the *Crusade* Series' credit list and after plaintiffs had alleged their claims for reverse passing off and unfair competition in this action. *See International Star Class*, 80 F.3d at 753-54.

20.     To establish defendants' profits under the Lanham Act, plaintiffs need only prove defendants' infringing sales; defendants must prove any costs or other claimed deductions from those sales. 15 U.S.C. § 1117(a). Again, the Court resolves any doubt as to the computation of costs or profits under the Lanham Act in plaintiffs' favor. *Oddzon Products, Inc. v. Diana Dolls Fashions, Inc.*, No. C-92-20578-JW, 1997 WL 33019 (N.D. Cal. 1997). In this case as itemized earlier in this Order, plaintiffs are entitled to $783,606.83 as the award of defendants' profits under the Lanham Act.

21.    15 U.S.C. § 1117(a) confers authority on the Court to treble or

otherwise increase the award of defendants' profits in order to deter future infringing

conduct. *Pepsico, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).

An award of double damages is particularly appropriate here because, as described

above, defendants' infringement was willful. Thus, plaintiffs are entitled to double

defendants' profits for a total award of $1,567,213.66 under the Lanham Act. *See,*

*e.g., id.; Taylor Made Golf Co., Inc. v. Carsten Sports, Ltd.*, 175 F.R.D. 658, 663

(S.D. Cal. 1997); *New York Racing Association, Inc. v. Stroup News Agency Corp.*,

920 F.Supp. 295, 301 (N.D.N.Y. 1996).

### C.    Injunctive Relief

22.    In addition to monetary recovery, plaintiffs are entitled to injunctive relief

under the Copyright Act, Lanham Act, and California unfair competition law.

### Copyright Infringement

23.    Under § 502(a) of the Copyright Act, plaintiffs are entitled to a

permanent injunction prohibiting defendants from any further infringement of

plaintiffs' copyrighted material. *See, e.g., CDN Inc. v. Kapes*, 197 F.3d 1256, 1262

(9th Cir. 1999); *Sega Enterprises*, 948 F.Supp. at 940; *A&M Records*, 948 F.Supp.

at 1460. In light of the fact that *Campaigns* parrots the unique structure, format,

sequencing, organization, and tone of the Book, both by its narration and by its

visual images, not to mention its focus on obscure stories having no specific

historical significance, plaintiffs are entitled to an injunction prohibiting defendants'

distribution of any version of *Campaigns* that uses elements of original subject matter contained in the Book — including its structure, format, contents, sequencing, organization, and tone — not merely *Campaigns'* use of the literal text from the Book. *See Johnson Controls, Inc. v. Phoenix Control Systems*, 886 F.2d 1173, 1175 (9th Cir. 1989); *Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990).

24.    In addition to an injunction that permanently restrains defendants from further distributing *Campaigns*, plaintiffs are also entitled to an order that requires defendants to deliver and surrender to plaintiffs all negatives, positive film prints, transcriptions, recordings, video masters or videocassettes in their possession that infringe on or which may have been used to infringe plaintiffs' exclusive rights under the copyrights to the Book.  *See* 17 U.S.C. § 503(b); *CyberMedia v. Symantec Corporation*, 19 F.Supp. 1070, 1079 (N.D. Cal. 1998).

### Lanham Act Infringement and Violation of California Unfair Competition Law

25.    The Lanham Act and California unfair competition law also expressly provide for injunctive relief.  15 U.S.C. § 1116; Cal. Bus. & Prof. Code § 17203. Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement. *Century 21 Real Estate Corp. V. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1980); *see also Sega Enterprises*, 948 F.Supp. at 940; *A&M Records*, 948 F. Supp. at 1460.  An injunction is appropriate even when the defendant

purports to have stopped its infringing conduct, as defendants claim in this case. *See, e.g., Polo Fashions, Inc. v. Dick Bruhn, Inc.* 793 F.2d 1132, 1135 (9th Cir. 1986); *E. & J. Gallo Winery v. Consorzio Del Gallo Nero*, 782 F.Supp. 457, 468 (N.D. Cal. 1991).

26.    Under the Lanham Act, plaintiffs are entitled to an injunction permanently restraining defendants from falsely passing off *Campaigns* as their own or otherwise misappropriating plaintiffs' property and engaging in deceptive trade practices and unfair competition.

27.    Under California unfair competition law, plaintiffs are entitled to a permanent injunction against continued acts of unfair competition.

### D.    Attorneys' Fees and Costs

28.    Pursuant to Fed.R.Civ.P. 54(d), plaintiffs may file a motion for attorneys' fees and costs.

### E.    Defendants' Claimed Affirmative Defenses

29.    None of the affirmative defenses alleged and argued by defendants in opposition to plaintiffs' contentions as to their remedies affects the Court's ultimate determination of those remedies.  As this Court ruled in granting plaintiffs' Motion in Limine No. 3, defendants are precluded from introducing evidence supporting their affirmative defenses that was not produced in discovery.  Accordingly, the Court's determination of the appropriate remedies for defendants' infringement of plaintiffs' rights set forth above is not affected in any way by these claimed

affirmative defenses.

Plaintiff is instructed to prepare a Judgment for the Court's signature within

ten (10) days of the issuance of this Order.

DATED this 29th day of August 2000.


FLORENCE-MARIE COOPER, Judge
UNITED    STATES    DISTRICT    COURT