

1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware Corporation, S F M ENTERTAINMENT LLC., a Delaware limited liability company, and, NEW LINE HOME VIDEO, INC., a New York corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>DASTAR CORPORATION, an Oregon corporation, ENTERTAINMENT DISTRIBUTING, an Oregon corporation, and MARATHON MUSIC & VIDEO, an Oregon corporation,<br><br>Defendants.<br>_____<br>AND RELATED COUNTERCLAIMS, | CV 98-7189 FMC (Ex)<br><br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |



28

1    .    ·This case having come on for trial before the Court on October 11, 2002, and

2    the Court having heard the evidence, considered the briefs and arguments of

3    counsel, and observed the demeanor of the witness, does hereby make, pursuant to

4    Fed. R. Civ. P. 52 and Central District Local Rule 14.3, the following Findings of

5    Fact and Conclusions of Law:

6

7    I.    **PRELIMINARY FINDINGS**

8        A.    **Procedural History**

9        1.    On September 2, 1998, plaintiffs sued defendants for copyright

10    infringement, alleging defendants' sale of copies of plaintiffs' *Crusade in Europe*

11    videos ("Videos"), as *Campaigns in Europe*, infringed plaintiffs' exclusive right to

12    distribute videos based upon General Eisenhower's still-copyrighted *Crusade in*

13    *Europe* book ("Book").   On March 29, 1999, plaintiffs amended their complaint,

14    alleging additional "reverse passing off" and unfair competition claims, based on

15    defendants' falsely taking credit for "creating" the Videos.

16

17        2.    On October 22, 1999 and November 8, 1999, defendants and plaintiffs

18    filed cross-motions for summary judgment. On January 4, 2000, the Court granted

19    plaintiffs' motion and denied defendants'.   First, the Court held that, as a matter of

20    law, defendants infringed plaintiffs' exclusive license to the Book because (1) it

21    was uncontroverted that "Eisenhower wrote the [B]ook . . . at the 'instance and

22    expense' of Doubleday" and Doubleday "had the right to supervise" Eisenhower's

23    writing and, thus, Doubleday properly renewed the Book's copyright as proprietor

24    of a work-for-hire, and (2) defendants admitted copying footage containing

25    "significant portions of the Book" to create *Campaigns*.   Second, the Court held

26    that defendants violated the Lanham Act and unfair competition law.  Applying this

27    Circuit's "reverse passing off" test, it concluded that uncontroverted evidence

28    showed defendants: (1) "bodily appropriat[ed]" plaintiffs' work, having "admit[ted]

LA2·650879.3

1 ‏that they copied the entire *Crusade in Europe* series to create *Campaigns*," except

2 for "minor changes," and (2) falsely identified themselves as *Campaigns'* sole

3 producers, when others created, restored and/or distributed the work.

4

5     3.    Beginning August 9, 2000, the Court conducted a three-day bench trial

6 on remedies. On August 29, 2000, the Court issued detailed findings of fact and

7 conclusions of law ("Prior Findings") holding that defendants willfully violated the

8 Copyright and Lanham Acts and plaintiffs were entitled to (1) $150,000 in statutory

9 damages *or* $783,606 as defendants' profits under the Copyright Act, (2)

10 $1,567,213.66 under the Lanham Act ($783,606.83 in profits, doubled under 15

11 U.S.C. §1117(a)), and (3) injunctive relief. To avoid double-counting profits under

12 the Copyright and Lanham Acts, plaintiffs elected statutory copyright damages.

13 Accordingly, the Court entered judgment for $1,717,213.66 ($150,000 under the

14 Copyright Act and $1,567,213.66 under the Lanham Act).

15

16     4.    On September 28, 2000, defendants appealed the Court's summary

17 judgment decision and award of damages. The sole ground on which defendants

18 sought to overturn the Court's finding of copyright infringement related to the

19 alleged invalidity of the Book's renewal copyright, *i.e.*, whether the Book was

20 properly renewed by Doubleday as a work for hire. Defendants did not appeal the

21 Court's findings that plaintiffs had standing to sue as the exclusive licensee and

22 sublicensees under Doubleday's copyright to the Book (chain of title) and that

23 plaintiffs copied significant portions of the Book to produce *Campaigns*.

24

25     5.    On April 19, 2002, the Ninth Circuit affirmed the Court's grant of

26 summary judgment and award of damages under the Lanham Act, but reversed the

27 Court's grant of summary judgment on plaintiffs' copyright infringement claim.

28 The sole basis of the Ninth Circuit's reversal was its conclusion that there was "a

1   . triable issue as to whether [General Eisenhower] intended the book to be a work for

2   hire." The Ninth Circuit concluded: "Because '[q]uestions involving a person's

3   state of mind . . . are generally factual issues inappropriate for resolution by

4   summary judgment [citation], we reverse the district court's summary judgment for

5   [plaintiffs] on the copyright infringement claim and remand for trial."

6

7   **B.    Trial**

8   6.    On October 11, 2002, the Court conducted a one-day bench trial on

9   whether the Book is a work for hire.   Plaintiffs called one witness, Samuel

10  Vaughan, who worked at Doubleday -- the Book's publisher -- and its successor,

11  Random House, for fifty years.

12

13  7.    Mr. Vaughan first began working at Doubleday in 1952.  (10-11-02

14  Trial Transcript "Tr." 5:15-16.)  He rose through the ranks of Doubleday from his

15  initial years in sales and advertising to positions as Senior Editor and Executive

16  Editor.  (Tr. 6:9-18.)  Mr. Vaughan then served as the President and Publisher of

17  Doubleday for twelve years, and finally became the company's Editor-In-Chief.

18  (Tr. 6:19 – 7:2.)  Over his fifty-year career in publishing, Mr. Vaughan has edited

19  hundreds of books, specializing in books concerning politics and public figures.

20  (Tr. 7:3-24.)

21

22  8.    Mr. Vaughan served as an editor on books written by General

23  Eisenhower and other members of his family.  Mr. Vaughan worked directly with

24  General Eisenhower on his presidential memoirs, a six-year, two-volume project

25  detailing his two terms in the White House.  (Tr. 13:5-16.)  Mr. Vaughan was the

26  day-to-day editor on the project under the supervision of Ken McCormack, who had

27  previously been the principal editor on the Book.  (Tr. 12:1-7, 13:17-18.)  In editing

28  *The White House Years*, Mr. Vaughan not only worked directly with General

LA2·650879 3

-3-

1  .Eisenhower, but also with his son, John Eisenhower, who also was employed as an

2  editor by Doubleday to work on his father's book. (Tr. 13:19-25.) Mr. Vaughan

3  also edited General Eisenhower's subsequent autobiographical book, *At Ease:*

4  *Stories I Tell My Friends.* (Tr. 14:16 – 15:3.) Mr. Vaughan went on to be the

5  supervising editor of *Strictly Personal*, the memoir by John Eisenhower of his life

6  to date. (Tr. 15:4-15.) Mr. Vaughan also edited two books about politics by Milton

7  Eisenhower, General Eisenhower's late brother. One book was titled, *The*

8  *President Is Calling*, and was about assisting presidents from outside the White

9  House. (Tr. 16:15-23.)

10

11       9.    In addition to working directly with General Eisenhower and members

12  of his family, Mr. Vaughan also worked directly for many years with Doug Black,

13  the former President of Doubleday, and Mr. McCormack. (Tr. 9:13 – 13:4.) Mr.

14  McCormack, in particular, was Mr. Vaughan's mentor and they worked together on

15  dozens of books. (Tr. 12:11-13.)

16

17       10.    As Mr. Vaughan said, he had "endless" discussions about the Book

18  with General Eisenhower, John Eisenhower, Milton Eisenhower, Black,

19  McCormick, and others at Doubleday. (Tr. 17:19 – 18:2.) Mr. Vaughan testified in

20  particular that he needed to be briefed on the background of the book as he was

21  about to be assigned to edit *The White House Years*. (Tr. 21:23 - 22:1.) Moreover,

22  he discussed the Book a great deal with General Eisenhower in the context of their

23  work on *At Ease,* which referred in some detail to the origin and creation of the

24  Book. (Tr. 21:11-16.)

25

26       11.    Mr. Vaughan testified that no one who directly worked on the Book is

27  still alive. (Tr. 16:24 – 17:5.) ~~As the Court noted earlier, he is~~ Mr. Vaughan ~~is~~ was in an excellent

28  position to testify to his knowledge concerning the events surrounding the Book's



1   creation.   (Tr. 10:4-9.)  The Court believes Mr. Vaughan has sufficient personal

2   knowledge and foundation for his testimony about the Book and its origin, based on

3   his close working relationships with Doubleday executives, General Eisenhower

4   and members of the Eisenhower family.  The Court finds that Mr. Vaughan is a

5   credible witness, and his testimony concerning the Book was reliable and

6   trustworthy.

7

8       12.    Defendants called no witnesses at trial.

9

10      13.    The parties presented closing arguments at trial, and submitted post-

11   trial briefs on December 13, 2002.

12

13   **C.    Parties**

14      14.    Plaintiff Twentieth Century Fox Film Corporation ("Fox") is a

15   Delaware corporation having offices and a principal place of business in Los

16   Angeles, California.  (August 29, 2000 Finding of Fact No. 1)

17

18      15.    Plaintiff SFM Entertainment LLC ("SFM") is a Delaware limited

19   liability company having offices and a principal place of business in New York,

20   New York. (August 29, 2000 Finding of Fact No. 2)

21

22      16.    Plaintiff New Line Home Video, Inc. ("New Line") is a New York

23   corporation having offices and a principal place of business in New York, New

24   York.  (August 29, 2000 Finding of Fact No. 3)

25

26      17.    Defendant Dastar Corp. ("Dastar") is an Oregon corporation with its

27   principal place of business located in Eugene, Oregon.  (August 29, 2000 Finding

28   of Fact No. 4)

1    . 18.    Defendant Marathon Music & Video is an Oregon corporation with its

2   principal place of business located in Eugene, Oregon. (August 29, 2000 Finding

3   of Fact No. 5)

4

5       19.    Defendant Entertainment Distributing is an Oregon corporation with

6   its principal place of business located in Eugene, Oregon. (August 29, 2000

7   Finding of Fact No. 6)

8

9   **II.    EVIDENTIARY FINDINGS**

10       20.    Because the parties' evidentiary objections bear upon the Findings of

11   Fact in Part III and the Conclusions of Law in Part IV, the Court makes its

12   evidentiary findings ~~before addressing the merits of whether the Bookkeeper work or~~ *(in a separate) order, filed*

13   ~~the.~~ *concurrently herewith.*

14

15     ~~21.    On October 8, 2002, plaintiffs and defendants submitted a stipulation~~

16   and proposed order identifying the trial exhibits to which the parties did not object

17   to being admitted into evidence. The Court signed the order on October 9, 2002.

18   Accordingly, plaintiffs' exhibit nos. 300, 302-305, 307-318, 320-323, 325-336,

19   338-341, 345-350, 352, 355-359, 362-371, 373-377, 379-382, 387, 389-392, 500,

20   501, and 503 are admitted into evidence without objection. Similarly, defendants'

21   exhibit nos. 400-427, 429-432, 434-438, 440-444, 448, 450, 452, 453, 455, 458,

22   459, 461, 463-465, 467-482, 484-499, 600-625, 627-630, 633, 635-644, 646, 648-

23   668, 670, 672, and 676 are admitted into evidence without objection. In addition,

24   the Court already ruled at trial that plaintiffs' exhibit no. 342 is admissible based on

25   Mr. Vaughan's testimony authenticating the document. With respect to those other

26   ~~exhibits to which the parties did object, the~~ Court makes the following findings:

27

28

1   · 66.   Exhibit 674, an excerpt from a book by Stephen Ambrose, is

2   inadmissible.  Mr. Ambrose' book is hearsay.  Unlike *At Ease*, in which General

3   Eisenhower describes his own personal experiences, and *Strictly Personal*, in which

4   John Eisenhower details information he acquired as a result of his close relationship

5   with his father, Mr. Ambrose's book lacks sufficient indicia of trustworthiness and

6   reliability to satisfy the residual hearsay exception.  There is no indication that Mr.

7   Ambrose has personal knowledge regarding matter that he discusses.  And, to the

8   extent his comments are based on research, the Court does not know what source

9   material he used or the basis for any of the statements in his book.

10

11      67.   Exhibit 675, undated memoranda, is inadmissible.  There is no basis

12  for knowing who wrote these documents, whether they were even written by the

13  same person, when they were written, why they written, and for whom they were

14  written.  They are unreliable and the quintessential example of hearsay.

15

16  **III.   FINDINGS OF FACT ON THE BOOK'S WORK FOR HIRE STATUS**

17      **A.   Eisenhower Decided to Write An Account of His Experiences
            During World War II At Doubleday's "Instance"**

18

19      ~~68.~~ 21.   General Eisenhower was appointed commander of U.S. troops in

20  Europe during World War II (the "War"), and later became Supreme Commander

21  of the Allied Expeditionary Forces.  (August 29, 2000 Finding of Fact No. 7)

22

23      ~~69.~~ 22.   Because of his extraordinary leadership roles, General Eisenhower's

24  perceptions and view of the War were of unique historic importance.  (January 6,

25  2000 Court Order Granting Summary Judgment ("January 6 Order") at 13; August

26  29, 2000 Finding of Fact No. 8.)

27

28

1    **23**
~~10.~~    As a result, for years, many book publishers courted General

2    Eisenhower, trying to persuade him to capture his unique perspective in a book

3    about the War. (Exhs. 300-2, 302-1,-3,-5,-7,-9.)

4

5    **24**
~~11.~~    Time after time, General Eisenhower rejected their offers. (Exhs. 300-

6    2, 302-4,-6,-8,-10 to -13.)[1]

7

8    **25**
~~12.~~    Eisenhower continued to spurn all book offers until Doubleday and

9    *The New York Herald Tribune* ("*Tribune*") were able to change his mind. With the

10    help of William Robinson ("Robinson"), Vice President of *Tribune* (which wanted

11    to serialize excerpts of General Eisenhower's memoirs), Douglas Black ("Black"),

12    President of Doubleday, persuaded Gen Eisenhower to agree to write his personal

13    account of the War. (Tr. 19:15 – 22:1; Exhs. 300-2,-3; 301.)

14

15    **26**
~~13.~~    Robinson and Black informed Gen Eisenhower that books about the

16    War containing inaccuracies had already begun to appear. (Tr. 19:15-22:1; Exh.

17    300-2,-3.)

18

19    **27**
~~14.~~    Doubleday and *Tribune* appealed to Eisenhower's sense of history,

20    emphasizing that as the Allies' commander, only he could tell people what really

21    happened and prevent others from distorting the truth about the War. (Tr. 19:15 -

22    22:1; Exhs. 300-2,-3; 301)

23

24    **28**
~~15.~~    In *At Ease*, General Eisenhower unambiguously credited Black's and

25    Robinson's pitch as convincing him to write the Book, when all other publishers

26    before them had failed:

27

28    ----
[1] All citations to exhibits refer to the parties' designated trial exhibits unless otherwise noted.

1    · Many months before I left the Army, I was approached by
     representatives of various publishing houses, each with a different
2    reason for wanting to publish my memoirs of the war. To all of these
     proposals I turned a deaf ear.

3

4    Many of the publishing proposals were purely financial. . . . [M]oney
     alone had no temptation. I continued to turn down all proposals. . . .
     But finally two men, Douglas M. Black of Doubleday, and William
5    Robinson, of the *New York Herald Tribune*, came to me with a
     different kind of argument. Roughly it went like this:

6

7    Historians, they said, are often inclined to use contemporary accounts
     as source material. Books about entire wars and whole campaigns
     written by authors who were not necessarily participants are frequently
8    used as main sources, or, in fact, sole sources unless there are extant
     accounts by participants that differ in important facts and conclusions.
9    They showed me, or reminded me of, a number of books which had
     been written hurriedly, so as not to "miss the market." Certain of these
10   books on the African and European campaigns were riddled with
     inaccuracies. They contained conclusions that had slight basis in fact
11   and were the hasty conceptions or misconceptions of authors who had
     a flair for writing rapidly and fluently. Mr. Black and Mr. Robinson,
12   who were functioning as partners for the proposal, pointed out errors
     in these publications and said that since these were written during my
13   lifetime and were not denied or corrected by me, the historians of the
     future might give them a high degree of credibility. "You owe it to
14   yourself, to the country, and to history, to tell the personal story of
     your European campaigns on a factual basis, annotating the book as
15   well as you can. It can serve as a better picture of what was done in
     your theater and by your headquarters than other, sometimes biased or
16   prejudiced, reports."

17   This reasoning impressed me. After I thought it over for a time, they
     came back and I said, "I'm ready to undertake this task but on one
18   condition only: it seems to me that every time the subject is brought
     up, people talk about all the various kinds of publishing rights and so
19   on and I don't want to be bothered with such things. Now if you
     people can come up with a single package to cover the whole affair so
20   that I don't have to argue with too many people, I will probably
     undertake something." (Exh. 300-2,-3.)

21

22   *29*
     76.    General Eisenhower's son, John, confirmed his father's recollection

23   that Doubleday motivated him to write the Book:

24

25   Dad had at first shown minimal interest in writing *Crusade in Europe*,
     considering it an exploitation of the work and sacrifices of others. However,
     when book after book about World War II came out, most of them full of
26   inaccuracies, Douglas M. Black, president and chairman of Doubleday and
     company, convinced him that it was up to him to set the record straight.

27   (Exh. 301).

28

LA2·650879 3

1    ***30***
     ~~77.~~    General Eisenhower's long-time friend and aide, Arthur Nevins,

2    explained that he received a letter from Eisenhower asking him to work on the

3    Book only after Doubleday came onto the scene: "I got a letter from General

4    Eisenhower saying that he had been requested by Doubleday to write a book on his

5    memoirs and he would do so if I would come and help him with the factual

6    statements." (Exh. 306-2,-3.)

7

8    ***31***
     ~~78.~~    Like other prominent figures, General Eisenhower ~~may have~~ *had*

9    considered making public his unique perspectives and jotted down some thoughts

10   to assess whether he had anything worth communicating, but he had not committed

11   to writing his memoirs until persuaded by Doubleday and *Tribune*.  (Exhs. 300-2,-

12   3, 301; Tr. 19:15 – 22:1.)  For example, in 1945, he previously "tried to draft a bit

13   of narrative just to satisfy [him]self that [he] had something to say that was worth

14   hearing," but, at that time, he had "not convinced [him]self of this at all." (Exh.

15   413.)  The following year, he told a friend that he had only "a vague feeling" that he

16   might write about the War, as he was "still far from having developed any specific

17   plan to that effect." (Exh. 431.)  Any dabbling with writing was strictly an

18   "experiment" because he was "still so uncertain as to whether [he] will ever attempt

19   anything of this kind." (Exh. 432.)  While he jotted down "occasionally a bit of

20   narrative," he did so "more as a protection to [him]self in the event [he] ever did

21   want to write, than as the expression of any intent" of doing so. (Exh. 434.)  Thus,

22   the Court finds that while Eisenhower understandably gave consideration to

23   chronicling his War experience after so many requests (Exhs. 437, 441), there is

24   insufficient evidence that he actually decided to write until Doubleday and *Tribune*

25   convinced him of doing so. (Exhs. 302-10 to –13; 442; 443; 444; 300-2,-3; 301; Tr.

26   19:15 – 22:1.)

27

28

***–10–***
***–25–***

**B.    Eisenhower Agreed To Write The Book For Doubleday In
December 1947**

**32**
~~79.~~    General Eisenhower, *Tribune's* Robinson, Black and McCormick of
Doubleday, and Eisenhower's lawyer, Donald Richberg, met in Washington, D.C.,
on December 30, 1947.  (Exhs. 308-8, 309-6, 310-6, 669-5.)

**33**
~~80.~~    Before heading to Washington, D.C. for this trip, Black and Robinson
had "decided to make [an] offer" to Eisenhower for his War memoirs.  (Exh. 669-
5.)

**34.**
~~81.~~    At the meeting, Black and Robinson told Eisenhower "what we had in
mind, and he said he thought that that was very fair."  (Exh. 669-6.)  After Richberg
joined the meeting, Eisenhower first asked his attorney if he could put their deal in
writing, but then said "Well, I don't much care.  I'm not going to sue anybody."
(Exh. 669-7.)

**35.**
~~82.~~    General Eisenhower then accepted their terms with a handshake.
(Exh. 669-7.)  Black said "that was the only contract or agreement we had."  (Exh.
669-7.)

**36**
~~83.~~    In his December 30, 1947 calendar entry, Robinson wrote (in quotes):
"closed deal re: book and serialization."  (Exh. 308-8.)  Robinson's view did not
change over time.  In a memo written many years later – in an exhibit put forth by
defendants -- Robinson recalled that "an oral agreement was made."  (Exh. 675-6.)

**37**
~~84.~~    Likewise, in a December 31, 1947 letter just one day after the big
meeting, Eisenhower informed his friend, Joseph Davies, that "all is settled on a
'gentleman's agreement' basis."  (Exh. 322.)  In the same letter, Eisenhower

1    explained that his attorney was talking to the Treasury to determine whether his

2    agreement could be put in a writing that would not jeopardize the favorable tax

3    treatment he was seeking for the Book.  (Exh. 322.)

4

5    38.    Just two days later, in a January 2, 1948 letter to Eisenhower,

6    Robinson told him that he was proud of their deal: "I feel honored, as does the

7    whole paper, that it is our good fortune to have the privilege of doing the job."

8    (Exh. 339.)

9

10    39.    Others affiliated with Eisenhower, *Tribune*, and Doubleday similarly

11    made statements reflecting that Eisenhower reached an agreement with Doubleday

12    by January 1948, despite the parties' decision not to put it in writing at that time for

13    tax reasons.  For example, in a January 13, 1948 letter to a potential syndicator, a

14    *Tribune* employee wrote that "a firm arrangement is in existence whereby

15    Doubleday and Company will publishing General Eisenhower's forthcoming book,

16    and the world rights for newspaper syndication will be handled by us."  (Exh. 328-

17    1.)  A February 2, 1948 memo from McCormick to Robinson stated that "[t]he

18    Book will be published by Doubleday & Company, Inc." (Exh. 329), and an April

19    29, 1948 memo similarly proclaimed that "*Crusade in Europe* is a great book and

20    one Doubleday & Company is privileged to publish."  (Exh. 333-3.)  In the same

21    vein, two February 1948 letters from an aide to Eisenhower to international

22    publishers referred to Doubleday as "designated publisher" (Exhs. 330 and 331),

23    and another letter stated that "Doubleday . . . will publish the Memoir."  (Exh. 332.)

24    Doubleday's publication of the Book similarly was described as a certainty in a

25    May 15, 1948 story in *Tribune* (Exh. 335), in a May 28, 1948 letter from

26    McCormick to someone who McCormick solicited for quotes to use in promoting

27    the Book (Exh. 336), and in a May 29, 1948 letter between *Tribune* employees.

28    (Exh. 337.)

LA2 650879 3

-12-
-27-

1

**· C.    Tax Treatment of Eisenhower's Income From the Book**

2    40
~~87.~~    Shortly before agreeing to write the Book for Doubleday, General

3    Eisenhower contacted the IRS to inquire how it would regard his relationship with

4    "[c]ertain publishers . . . for tax purposes."  (Exhs. 311, 322.)

5

6    41
~~88.~~    In determining whether Eisenhower's Book income was entitled to

7    capital gains treatment, the IRS focused exclusively on then-section 117 of the

8    Internal Revenue Code ("I.R.C."), which considered only whether Eisenhower was

9    a first-time author, and the amount of time between when Eisenhower completed

10    the manuscript and when he put his deal with his publisher into writing.  (Exhs.

11    312, 315.)

12

13    42
~~89.~~    The IRS limited its analysis to how it viewed the Book "for tax

14    purposes."  (Exhs. 312, 320-1.)

15

16    43
~~90.~~    The IRS did not analyze whether the Book was prepared at

17    Doubleday's "instance and expense," or whether Doubleday had the right to

18    supervise or control Eisenhower's work.  In fact, the IRS did not address the

19    Book's copyright at all.  (Exhs. 312, 315.)

20

21    44
~~91.~~    The IRS informed Eisenhower that the income from the Book would

22    be taxable at a reduced, long-term capital gain rate only if his book contract was

23    executed more than six months after he finished the manuscript.  (Exhs. 312, 315.)

24

25    45
~~92.~~    Therefore, the timing of Doubleday's *written* agreement with

26    Eisenhower was not an accident.  Because Eisenhower finished his first draft on

27    approximately March 24, 1948 (Exhs. 345-10, 351), he could not put his agreement

28    with Doubleday in writing until approximately September 24, 1948 to obtain

1  favorable tax treatment. Eisenhower complied with the IRS' requirements and

2  finally memorialized his prior agreement on October 1, 1948, just days after the six-

3  month waiting period expired. (Exh. 625-2.)

4

5  ~~96~~ 95. In order to adhere to the strict standards for capital gains treatment,

6  Doubleday and Eisenhower were sensitive not to put anything about their

7  agreement in writing before the end of the IRS-mandated period. For example, in

8  March 1948, when Nelson Doubleday wrote General Eisenhower to express how

9  pleased he was that Doubleday was going to publish the Book, he innocently

10 referred to their agreement as a "contract." (Exh. 326.) Days later, to comply with

11 the tax code, Eisenhower wrote back stating that there was "no contract for the

12 publication of the Book." (Exh. 490.) However, even in that same letter,

13 Eisenhower signaled that he nevertheless had an agreement in place with

14 Doubleday, as he told Nelson Doubleday that "at any time subsequent to six

15 months, . . . I shall be prepared to enter into a contract with the Company without

16 regard to what any other publishing house might propose in the interim." (Exh.

17 490)

18

19 ~~97~~ 94. For the same reason -- to comply with IRS formalities -- Eisenhower

20 wrote Doubleday on March 24, 1948 that he finished a first draft of the manuscript

21 and that he would enter into an arrangement with the company for its publication if

22 he was satisfied that Doubleday had verified the Book's facts and he felt

23 comfortable with Doubleday's promotion campaign. (Exh. 491.) Mr. Black was at

24 Eisenhower's office at the Pentagon when Eisenhower wrote that letter, "which was

25 then brought out and read." (Exh. 669-10.) When Eisenhower got to the part about

26 "enter[ing] into an arrangement for us to publish it," Eisenhower told Black, "I just

27 put that in to make it seem circumstantial." (Exh. 669-10.) None of this came as

28 any surprise to Mr. Black, because he "had in mind that the arrangement could not

1   be completed for six months after the manuscript was completed, in order to qualify

2   for capital gains." (Exh. 669-10.)

3

4   48.   The IRS also conditioned capital gains treatment of Eisenhower's

5   Book income on Eisenhower "not retain[ing] any control over the use of the

6   completed manuscript." (Exh. 315.)

7

8   49.   Accordingly, in his December 1948 closing agreement with the IRS,

9   General Eisenhower covenanted that he had conveyed to Doubleday "forever ... all

10  rights of every nature pertaining" to the Book.   (Exh. 320-1.)

11

12  50.   The amount of Doubleday's and *Tribune's* payment under the parties'

13  written agreement was the same consideration that the parties agreed to in

14  December 1947. (Exhs. 320, 307, 669-6.)

15

16  **D.   Eisenhower's Writing Of The Book**

17  51.   Although the precise date on which Eisenhower began writing the

18  Book's manuscript is unclear, the Court finds that Eisenhower began writing the

19  Book *after* he reached an agreement with Doubleday and *Tribune* on December 30,

20  1947. (Exhs. 300-4,-5,-6; 347-4,-5; 473; 475; 479; 507-7,-9; Tr. 25:15- 26:2, 43:21

21  - 45:1)

22

23  52.   Although General Eisenhower used notes made throughout the War "to

24  jog and reinforce his memory," he otherwise wrote from scratch because he thought

25  only things he could remember off the top of his head would be of sufficient

26  interest to warrant being included in the Book.   As he stated in *At Ease:*

27          World War II was not far in the past and my memory

28          concerning details was fresh.   It was my belief that in a personal

LA2-650879 3                     -15-
                                 30

memoir, only those things should be dealt with that were of such importance that I could not possibly have forgotten them. I did however, need the dates and other details from the documents." (Exh. 300-4,-5.)

53
~~100.~~  After deciding to begin the Book with the Nazis' surrender at Rheims, he "rapidly produced the first draft, ... hand[ing] each chapter to [his] researcher as he wrote it." (~~ER~~ EXH 300-5.)

54
~~101.~~  In writing the Book, Eisenhower recalled that he "habitually arose at six" and "worked approximately sixteen hours a day, . . . dictating or correcting old drafts until something like 11:00 at night." (~~ER~~ EXH 300-5; Tr. 25:15 – 26:2, 43:21 – 44:4)  He "kept three secretaries busy" while he was writing.  (Exh. 300-5.)

55
~~102.~~  His publisher, Mr. Black, also recalled how General Eisenhower wrote the Book once he reached an agreement with Doubleday:

> It might be interesting to throw in how the book was written. He wrote a good deal of it longhand, and then, within a day or two, we got a good stenographer named Douglas Wallop who is known to a lot of people as the fellow who wrote "The Day the Yankees Lost the Pennant." He's a man with some talent aside from being a crack stenographer. The routine was that the President would dictate in the morning, the stuff would be transcribed, and after one day at least, he could revise in the afternoon and on into the evening. And he worked steadily on that drill until the end of March. Now, he was working merely from recollection, on stuff which was fairly clear in his mind. He always said he wanted to write about what he knew and nothing else. I don't mean knew because he'd been there when it happened, but the things that came to his attention, and that he knew about, rather than just a grandiose picture of the whole panorama. He said, "A lot of people are writing stories about this war. Corps commanders are writing books about the war. I want to put down what I knew about it, and the circumstances of each one of them." (Exh. 507-9)

56
~~103.~~  General Eisenhower sent drafts to Doubleday, section by section as he wrote them, for the editorial team's review and commentary. (Exhs. 300-5, 473, 479, 347-4,-5.)

## · E.    The Book Was Written at Doubleday's Expense

57 104.    Eisenhower received a one-time lump sum of $635,000 for writing the Book instead of ongoing royalties.  (Exh. 320-1; Tr. 34:15-23.)

58 105.    Mr. Vaughan testified that the payment of a lump sum was unusual and that he was unaware of any instance where Doubleday had paid a lump sum for a book that was not a work for hire.  (Tr. 36:10-13.)

59 106.    Eisenhower was paid only a guarantee against royalties for both *The White House Years* and *At Ease*; in both cases, the books' copyrights were registered in his name, not in Doubleday's.  (Tr. 36:25 – 38:14.)  *The White House Years* also was renewed in Eisenhower's name rather than as a work for hire.  (Tr. 37:13 – 38:1; Exh. 398).

60 107.    When a publisher makes a large lump sum payment to a writer, as Doubleday did here, the publisher bears the entire financial risk of the project.  If the book sells poorly, the publisher cannot recoup what it paid to the writer (in contrast to payment by royalties where, except for the guarantee, the writer is not paid unless the book sells.  (Tr. 36:1-9.)

61 108.    In addition to paying Eisenhower his flat fee for the Book, Doubleday paid the Book's secretarial and editorial expenses.  (Exhs. 367, 368; Tr. 32:16-21; 33:1-3.)

62 109.    Doubleday also hired and paid for fact-checkers to ensure the Book's accuracy.  (Exhs. 360, 361, 362.)

63
110.   Doubleday arranged and paid for the creation of the Book's maps (Exhs. 363, 380, 381.)

64
111.   Doubleday arranged and paid for the Book's photographs. (Exhs. 364, 365, 366, 379.)

65
112.   There is no evidence that Eisenhower paid a single expense associated with the Book.

F.   **Doubleday Had The Right to Supervise And Control General Eisenhower's Work On The Book**
66
113.   Doubleday was in "constant consultation" with Eisenhower as he was writing the Book. (Exh. 348-1.)

67
114.   On January 2, 1948, just two days after General Eisenhower agreed to write the Book for Doubleday, Robinson told General Eisenhower that it was "McCormick's function, as Doubleday editor, to supervise the necessary work in connection with the preparation of the manuscript." (Exh. 339-1.)

68
115.   Gen Eisenhower had regular meetings with the Doubleday editorial team while writing the Book. (Exhs. 300-5; 345; 346-2, Tr. 26:3-13.)

69
116.   This degree of in-person supervision was much greater than what Doubleday usually did for other works. As Mr. Vaughan testified: "What would have been typical would be to wait for the manuscript to be completed and then judge it as a whole and then have a couple of sessions or a couple of exchanges of letters discussing possible improvement. But to sit in the room and watch it as it

LA2:650879 3

-18-
-33-

1    came out was very difficult because it's hard to edit a book that is not complete.

2    You can't tell what the ending is. . . . But they did it." (Tr. 26:19 – 27:1.)

3

4    **70**
    ~~117.~~   In addition to face-to-face meetings with Eisenhower, Doubleday's

5    editorial provided extensive notes and comments as Eisenhower wrote the first draft

6    of the Book (Exhs. 340, 341, 342. 343, 344, 347, 349, 350) and throughout the rest

7    of 1948. (Exhs. 352, 353, 354, 355, 357, 359.)

8

9    **71**
    ~~118.~~   Arthur Nevins, the fact checker hired and paid by Doubleday, also

10    offered suggestions for modifications and additions to Eisenhower where the

11    original draft did not conform with historical facts. (Exhs. 306, 360, 361, ~~363.~~)

12

13    **72**
    ~~119.~~   Mr. Vaughan testified that Doubleday did "far more" fact-checking of

14    *Crusade* "than in the case of the average book." (Tr. 33:22-24.) Doubleday's

15    extensive fact checking was consistent with the Book being a work for hire

16    because, according to Mr. Vaughan, a work-for-hire publisher must assume

17    responsibility for the accuracy of books copyrighted in its name. (Tr. 34:7-14.)

18

19    **73**
    ~~120.~~   In sum, as Mr. Vaughan testified, Doubleday's work on the Book "was

20    a prodigious effort" and, in his fifty years of publishing, he has never seen a

21    comparable investment in time and manpower. (Tr. 25:20, 30:13-17.)

22

23    **74**
    ~~121.~~   Because the Book was General Eisenhower's personal story that he

24    knew best how to tell, Doubleday often deferred to Eisenhower's view on shaping

25    the Book's contents. As Mr. Vaughan testified, "They definitely sought the

26    opinions of General Eisenhower. That was the point of the book. It was to be a

27    book from his point of view." (Tr. 31:20-22, 49:8-13, 51:12-19.) Not Mr.

28    McCormick's and not Mr. Black's.

1    75
     122.    Doubleday had the right not to publish the Book if it did not want to.

2    (Tr. 32:2-5.)  Defendants did not present any live witnesses or other evidence

3    suggesting otherwise.

4

5    **G.    The Parties Acted As If Doubleday Owned Rights To The Book
         Following Eisenhower's December 30, 1947 Agreement With**

6    **Doubleday And *Tribune***

7    76
     123.    As described above, in January 1948, Doubleday staffed its top editor,

8    McCormick, who traveled to Virginia on a regular basis to work with Eisenhower

9    67-68
     on the Book.  (Finding of Fact Nos. 114-115.)  McCormick assembled a team that

10   provided written comments as Eisenhower wrote his first draft, and throughout the

11   spring and summer of 1948.  (Finding of Fact No. 117.)                                      70

12

13   77
     124.    Doubleday hired and paid for fact-checkers (Exhs. 360, 361, 362),

14   hired and paid for secretaries to work with Eisenhower around the clock (Tr. 32:16-

15   21, 33:1-3; Exhs. 367, 368), arranged and paid for the creation of the Book's maps

16   (Exhs. 363, 380, 381), and arranged and paid for the Book's photos.  (Exhs. 364,

17   365, 366, 379.)

18

19   78
     125.    As early as January 26, 1948, Doubleday also developed

20   specifications concerning the Book's price, size and publication date (Exh. 369-1),

21   and fine-tuned those plans in May and June.  (Exh. 369-2, -3.)

22

23   79
     126.    Doubleday helped select the Book's title in March 1948.  (Exhs. 370,

24   371.)

25

26   80
     127.    Doubleday also invested heavily in time and money to promote the

27   Book's sale throughout the Spring and Summer of 1948, long before putting its

28   agreement with Eisenhower in writing in the fall of 1948.  (Exh. 373.)

1     *81*
      ~~128.~~     Doubleday also wrote detailed ad copy for the Book in June 1948

2     (Exhs. 374, 375) and promoted the Book's impending sale in the August issue of

3     Doubleday Book News.  (Exhs. 373-4, ~~375~~, 377.)

4

5     *82*
      ~~129.~~     In January 1948, Eisenhower agreed to record one of his speeches or

6     orders to promote the Book *for Doubleday*.  (Exh. 372-2.)

7

8     *83*
      ~~130.~~     In February 1948, Doubleday began selling the international rights to

9     the Book, and continued negotiating with foreign publishers throughout the spring.

10    (Exhs. 382, 383, 384, 385, 386.)

11

12    *84*
      ~~131.~~     Similarly, *Tribune* commenced its international syndication efforts in

13    January 1948, and reported sales to domestic and international newspapers for

14    hundreds of thousands of dollars in March, April and May 1948.  (Exh. 387.)

15

16    *85*
      ~~132.~~     In June 1948, Doubleday also told The Book-of-the-Month-Club that

17    "we are going to promote this book [*Crusade*] as we have never promoted any book

18    in recent years" after the book was selected as a featured title.  (Exh. 338.)

19

20    **H.**     **Registration And Renewal Of The Book's Copyright**

21    *86*
      ~~133.~~     Doubleday considered the Book to be a work for hire "from the start."

22    (Tr. 39:24 – 40:4.)

23

24    *87*
      ~~134.~~     In 1948, Doubleday obtained certificates of registration for the

25    copyrights to the Book and *Tribune* excerpts.  Doubleday identified itself as

26    copyright claimant in these registrations.  (Exhs. 389, 390.)

27

28

LA2 650879 3

1    88

135. In contrast, for *The White House Years* and *At Ease*, later books by

2 General Eisenhower published by Doubleday that were *not* works for hire,

3 Doubleday identified Eisenhower rather than itself as the initial copyright claimant.

4 (Tr. 37:6-11, 37:24 – 38:14; Exh. 397.)

5

6    89

136. Doubleday timely renewed the copyrights to the Book and *Tribune*

7 excerpts in 1975 as the "proprietor of copyright in a work made for hire." (Exhs.

8 391, 392.)

9

10    90

137. Again, this was in stark contrast to *the manner in which* ~~how Doubleday renewed books that~~

11 were *not* works for hire; it renewed the *White House Years* in the name of John

12 Eisenhower, the executor of the Eisenhower estate, rather than its own as work-for-

13 hire proprietor. (Tr. 37:15 – 38:1; Exh. 398.) *At Ease* was renewed by operation of

14 law. *See* Conclusion of Law 38.

15

16    91

138. The original copyright application for the Book did not provide a space

17 or any instructions for a claimant to identify itself as proprietor of a work for hire,

18 in contrast to revised forms later used by the Copyright Office. (Exhs. 389, 390,

19 396.)

20

21    92

139. There are numerous examples -- in addition to the Book's registrations

22 -- where Doubleday did not identify itself as the proprietor of a work-for-hire in the

23 original applications, but did so in the renewals. (Exh. 399.) Doubleday, therefore,

24 did not have a uniform practice of identifying itself as work-for-hire proprietor in

25 registrations of books renewed on a work-for-hire basis.

26

27

28

1    93
     140.    General Eisenhower never mentioned to Mr. Vaughan that he believed

2    the Book's copyright should have been registered in his name rather than

3    Doubleday's.  (Tr. 40:14-17.)

4

5    94
     141.    Similarly, John Eisenhower never told Mr. Vaughan that he believed

6    that his father's estate was entitled to renew the Book's copyright in lieu of

7    Doubleday.  (Tr. 41:5-11.)  In fact, when defendants' belatedly offered to pay the

8    Eisenhower estate for using the Book in *Campaigns* (Exh. 394), John Eisenhower

9    refused because he did not believe his family owned any rights in the Book: "My

10   viewpoint ... is quite simple: the heirs of Dwight D. Eisenhower have no rights to

11   any compensation for the subsequent use of ... *Crusade*." (Exh. 395.)

12

13    95
     142.    Until this litigation, no one -- including the Eisenhower estate, the

14   party who defendants claim owned the Book's renewal rights -- ever claimed

15   ownership in or challenged Doubleday's renewal of Book's copyright.  (Tr. 40:10-

16   13, 40:18 – 41:3.)

17

18   **IV.    CONCLUSIONS OF LAW**

19        **A.    The Book Is Presumptively A Work for Hire**

20        1. The Copyright Act of 1909 (the "1909 Act") applies to this case because

21   the Book was created before Jan. 1, 1978, the effective date of the 1976 Act.

22   *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1427 (9th Cir. 1996).

23

24        2.    In the Ninth Circuit, works are "presume[d]" to be made for hire if

25   created "at the instance and expense of the employer (or commissioning party)."

26   *May v. Morganelli-Heumann*, 618 F.2d 1363, 1368 n.4 (9th Cir. 1980).

27

28

1                    1.    **The Book Was Prepared At Doubleday's "Instance"**

2        3.    The instance prong of the work-for-hire test is met "when the

3    'motivating factor in producing the work was the employer who induced the

4    creation.'" *Self-Realization Fellowship Church v. Ananda Church of Self-*

5    *Realization,* 206 F.3d 1322, 1326 (9th Cir. 2000), *cert. denied,* 531 U.S. 1126

6    (2001). As described in the preceding Findings of Fact, the evidence shows that

7    General Eisenhower, his son, John, his editor, Mr. Vaughan, and others all have

8    identified Doubleday as the motivating factor in the Book's creation.

9

10       4.    The fact that Doubleday and *Tribune* worked together as partners does

11   not preclude that Doubleday was the Book's motivating factor. *Picture Music v.*

12   *Bourne,* 457 F.2d 1213, 1217 (2d Cir.), *cert. denied,* 409 U.S. 997 (1972).

13

14       5.    The Court rejects defendants' contention that at best, Doubleday

15   convinced General Eisenhower to publish memoirs he had long decided to write.

16   As described in the preceding Findings of Fact, while Eisenhower may have

17   considered writing and jotted down some thoughts to assess whether he had

18   anything worth communicating, the Court finds that there is no evidence he

19   *committed* to writing his memoirs until persuaded by Doubleday and *Tribune.*

20

21       6.    The Court also rejects defendants argument that Doubleday could not

22   have been the Book's motivating factor because, by that time, he actually had

23   written the vast bulk of the Book. Defendants had the burden of proving that the

24   Book was "completely" or "fully developed" prior to Doubleday commissioning

25   him to write his memoirs. *In re Marvel Entertainment Group,* 254 B.R. 817, 832

26   (D.Del. 2000). *Cf. Kodadek v. MTV Networks, Inc.,* 152 F.3d 1209, 1211 (9th Cir.

27   1998). Defendants failed to meet that burden.

28

1      7.    Defendants failed to introduce (i) General Eisenhower's notes and

2  memoranda, (ii) the alleged "outline" and "introductory sections" they claim

3  Eisenhower created prior to his agreement with Doubleday, or (iii) the papers that

4  Eisenhower allegedly described to his wife. Because these materials were not

5  introduced into evidence, ~~there is no way~~ the Court can not compare these materials to

6  the Book to determine how much, if any, of the Book predated the Doubleday-

7  Eisenhower relationship. This evidentiary failure is fatal to defendants' claim of a

8  prior existing work. *Marvel,* 254 B.R. at 832.

9

10      8.    Moreover, even if Eisenhower used these materials verbatim in the

11  Book, they do not preclude Doubleday being the Book's motivating factor. The

12  Court finds that the 478-page Book cannot be considered to have been "fully

13  developed" before the Doubleday-Eisenhower relationship began based on a mere

14  "outline," a few "introductory sections" and/or some notes and memoranda, even

15  assuming that these documents ever existed. *Niss v. Columbia Pictures*, 57

16  U.S.P.Q.2d 1346, 1353-54 (S.D.N.Y. 2000), *aff'd*, 2002 WL 126352 (2d Cir.

17  2002); *Marvel*, 254 B.R. at 830-32; *Scherr v. Universal Match*, 417 F.2d 497, 409-

18  501 (2d Cir. 1969), *cert. denied*, 397 U.S. 936 (1970).

19

20           **2.**    **The Book Was Prepared At Doubleday's "Expense"**

21      9.    The "expense" element of the work-for-hire test is met where the

22  hiring party pays the independent contractor a fixed sum for his or her work, rather

23  than ongoing royalties. *Playboy Enterprises v. Dumas*, 53 F.3d 549, 555 (2d Cir.

24  1994), *cert. denied*, 516 U.S. 1010 (1995); *Niss*, 57 U.S.P.Q.2d at 1354; *Marvel*,

25  254 B.R. at 830; *Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 WL 398696, No. 00

26  Civ. 9569 at *20 (S.D.N.Y. 2002). As described in the preceding Findings of Fact,

27  the evidence shows that Eisenhower was paid such a fixed sum for his work on the

28  Book and, therefore, the Book was prepared at Doubleday's expense. The Court

1 | finds that in return for Doubleday's assuming the financial risk of paying

2 | Eisenhower a large sum upfront, ~~it is not unexpected for~~ the parties to intend that

3 | Doubleday own the copyright for its entire duration (*i.e.*, including its renewal) as

4 | work-for-hire proprietor.

5

6 |      10.    The Court's conclusion is reinforced by the fact that Eisenhower was

7 | paid a guarantee against royalties for other books that he wrote for Doubleday that

8 | were not works for hire.

9

10 |      11.    In addition, the evidence shows that Doubleday paid the Book's

11 | secretarial and editorial expenses. This too satisfies the expense test. *Philadelphia*

12 | *Orchestra v. Walt Disney*, 821 F.Supp. 341, 348 (E.D.Pa. 1993).

13

14 |      **3.    Doubleday Had The Right To Control Or Supervise**

15 |      12.    In the Ninth Circuit, the work-for-hire test does not include an

16 | additional supervision requirement where the hiring party and creator share a

17 | traditional working relationship. The only Ninth Circuit case referring to

18 | supervision as a prerequisite for work-for-hire status is *Self Realization*, 206 F.3d at

19 | 1326-27, which concerned whether the religious writings of a Swami monk living

20 | under a vow of poverty were created as works for hire for the church he founded.

21 | There, the court mentioned control or supervision only in the context of non-

22 | traditional relationships. Because the Swami and church did "not [have] the type of

23 | traditional relationship in which [a work-for-hire] presumption would necessarily

24 | hold," *id.* at 1327, the *Self-Realization* court applied the additional "supervision"

25 | requirement. Here, in contrast, Eisenhower and Doubleday shared a more

26 | traditional author/publisher relationship. Therefore, plaintiffs need not demonstrate

27 | supervision or control on the part of Doubleday to establish the Book's presumptive

28

-26-
~~-41-~~

1 | work-for-hire status. *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300

2 | (9th Cir. 1965); *May*, 618 F.3d at 1368 n.4.

3

4 |      13.    However, even if there were a supervision requirement in this Circuit,

5 | finding evidence of supervision or control is "a standard that is hard not to meet."

6 | *CCNV*, 490 U.S. at 750; *see also Frontino v. Avon Products*, 197 U.S.P.Q. 713, 714

7 | (S.D.N.Y. 1977); *Picture Music*, 457 F.2d at 1216. *CCNV v. Reid*, 490 U.S. 730,

8 | 750 (1989). *See, e.g., Frontino v. Avon Products*, 197 U.S.P.Q. 713, 714 (S.D.N.Y.

9 | 1977); *Picture Music*, 457 F.2d at 1216 (proprietor "ma[de] some revisions").

10 | Here, as described in the preceding Findings of Fact, the evidence shows that

11 | Doubleday exercised sufficient oversight over Eisenhower's work to satisfy the

12 | supervision test applied in out-of-circuit decisions.

13

14 |      14.    The Court rejects defendants' contention that General Eisenhower's

15 | hands-on approach and alleged micromanagement of the Book's contents precludes

16 | a finding that Doubleday had a right to supervision. As described in the preceding

17 | Findings of Fact, Doubleday's intention was for the Book to tell the story of the

18 | War from Eisenhower's point of view. Thus, the fact that Doubleday may have

19 | delegated to Eisenhower the authority to tell his story in the manner he chose is not

20 | inconsistent with the Book's work-for-hire status. *See Hogarth*, 2002 WL 398696

21 | at *19; *Playboy Enterprises v. Dumas*, 960 F.Supp. 710, 719 (S.D.N.Y. 1997),

22 | *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

23

24 |      15.    The Court also disagrees with defendants' assertion that it was

25 | impossible for Doubleday to have exerted adequate control or supervision over

26 | Eisenhower because he was a revered war hero. A preeminent public figure's

27 | stature does not preclude that person from being supervised for work-for-hire

28

1    purposes. *The Martha Graham School and Dance Foundation, Inc. v. Martha*

2    *Graham Center of Contemporary Dance*, 224 F.Supp.2d 567, 589 (S.D.N.Y. 2002).

3

4         16.    Even a total failure to supervise Eisenhower on the part of Doubleday

5    (notwithstanding all of the evidence to the contrary), however, would not preclude

6    work-for-hire status because, according to courts applying the control or

7    supervision requirement, there need only be a *theoretical* right to supervise or

8    control; actual exercise of that right is not controlling. *Marvel*, 254 B.R. at 829;

9    *Philadelphia Orchestra*, 821 F. Supp. at 348.

10

11         17.    By the time Congress adopted the 1976 Act, the hiring party was

12    presumed to have the right to supervise whenever, as Doubleday did here, it paid

13    for the work's creation. *Easter Seal Society v. Playboy Enterprises*, 815 F.2d 323,

14    327 (5th Cir. 1987), *cert. denied*, 485 U.S. 981 (1988); *Marvel*, 254 B.R. at 829;

15    *Murray v. Gelderman*, 566 F.2d 1307, 1310-11 (5th Cir. 1978). Thus, as long as

16    the hiring party has "the power to accept, reject, or modify [an artist's] work," the

17    control or supervision prong is satisfied. *Hogarth*, 2002 WL 398696 at *22;

18    *Picture Music*, 457 F.2d at 1217. As described in the previous Findings of Fact, the

19    unrebutted evidence shows that Doubleday had the right not to publish the Book if

20    it did not want to.

21

22         18.    In sum, the evidence shows that the Book was prepared at

23    Doubleday's instance and expense, and that Doubleday had the right to control or

24    supervise Eisenhower's work on the Book, which they exercised. Accordingly, the

25    Court concludes that the Book is presumptively a work for hire.

26

27

28

## B. Defendants Have Not Rebutted The Book's Presumptive Work-For-Hire Status

19.    Presumptive work-for-hire status can be rebutted only by "an express contractual reservation of the copyright in the name of the artist." *Lin-Brook Builders*, 352 F.2d at 300.

20.    *Defendants* "bear[] the burden of proving ... that such a contrary agreement was reached." *Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998).

21.    Defendants claim that the Book's tax treatment, Eisenhower's written agreement with Doubleday, and the copyright registrations to the Book and other works show an implied agreement that the Book was not a work for hire.  As described below, the Court disagrees and concludes that defendants have not rebutted the Book's presumptive work-for-hire status.

### 1.    Tax Treatment Of Eisenhower's Book Income

22.    Defendants contend that the taxation of Eisenhower's Book income rebuts the work-for-hire presumption because had Doubleday owned the Book's copyright from inception as proprietor, Eisenhower purportedly could not have received capital gains treatment because he would have had no capital asset to sell.

23.    However, the Court has not found in its research any case in which a court has ever decided work-for-hire status based on how the IRS taxed income generated by that work.  This makes sense, since tax law and copyright law serve different policies and are governed by different statutes.

LA2 650879 3

-29-
-44-

24.     The Internal Revenue Code commonly attributes property ownership for tax purposes to individuals who otherwise do not have title to or ownership rights in such property. *See e.g.*, I.R.C. §671 et seq.; I.R.C. §318.

25.     Similarly, other courts have recognized that property ownership under tax and other areas of law, including copyright, are distinct legal concepts. *See, e.g.*, *Irving Berlin Music v. U.S.*, 487 F.2d 540, 545-46 (Ct.Cl. 1973), *cert. denied*, 419 U.S. 832 (1974); *U.S. v. D.I. Operating*, 362 F.2d 305, 308 (9th Cir. 1966); *Frederick Music v. Sickler*, 708 F.Supp. 587, 591 (S.D.N.Y. 1989). *Cf. McFeely v. CIR*, 296 U.S. 102, 107-08 (1935).

26.     Defendants contend that two cases -- *Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) and *Boulez v. C.I.R.*, 83 T.C. 584 (Tax Ct. 1984) -- stand for the proposition that work-for-hire status can be governed by a work's tax treatment. However, the Court finds that in neither case did the court decide that a work was or was not made for hire based on the taxation of income generated by the work, as defendants ask the Court to do here.

27.     Contrary to defendants' suggestion, the *Aymes* court did not rule that the program was not a work for hire because the hiring party did not treat for tax purposes as a work for hire  In fact, the court never discussed the tax treatment of the program.   Rather, just as in any agency law case, *see, e.g.*, *Hilton Int'l Co. v. NLRB*, 690 F.2d 318, 322 (2d Cir. 1982), the *Aymes* court looked at who paid the plaintiff's taxes as one of many factors in determining whether the plaintiff was an employee or independent contractor.  Tax was not used as a surrogate for work-for-hire status.   Indeed, the program very well could have been a work for hire -- under the same tax scenario -- had there simply been a written agreement satisfying Section 101(2).

1    28.    Nor did tax treatment dictate copyright status in *Boulez*. The *Boulez*

2  court merely looked at the copyright status of the conductor's recordings as one of

3  multiple factors in deciding how to tax income generated from the recordings. It

4  did not decide whether the recordings were works for hire based on the manner in

5  which the recordings were taxed. While, based on the specific facts of *Boulez*,

6  copyright status in part helped determine tax treatment (and, as described above,

7  this is by no means the rule), the Court believes the inverse need not be true. Work-

8  for-hire status depends solely on the mutual intent of the hiring party and the

9  employee or independent contractor. *May*, 618 F.2d at 1368. The employee or

10 independent contractor should not be able to defeat (even unintentionally) the hiring

11 party's expectations by understandably seeking favorable tax treatment for him or

12 herself. ~~If~~ *Once* Doubleday and Eisenhower mutually agreed that he would write the

13 Book as a work for hire (~~as they did here), the Court believes that~~ Eisenhower's

14 unilateral statements to the IRS cannot change what Eisenhower and Doubleday

15 previously intended.  The Court's conclusion is reinforced by the fact that

16 defendants have not pointed to a single case finding that a work's tax treatment

17 dictated its previously agreed-to work-for-hire status.

18

19    29.    ~~The Court does not believe it makes sense for this case to be the first to~~

20 ~~do so, because, as described in the previous Findings of Fact, the evidence shows~~

21 that Eisenhower's dealings with the IRS were limited to tax issues. In determining

22 whether Eisenhower's Book income was entitled to capital gains treatment, the

23 Treasury focused only on then-section 117 of the I.R.C. -- whether Eisenhower was

24 a first-time author, and the amount of time between when Eisenhower completed

25 the manuscript and when he put his deal with his publisher into writing -- *not*

26 elements relevant to copyright ownership under the 1909 Copyright Act. The key

27 point is: the IRS did not analyze whether the Book was prepared at Doubleday's

28 "instance and expense," the dispositive factors for work-for-hire treatment under

1   copyright law.   In fact, neither the IRS nor Eisenhower referred to the Book's

2   copyright in their communications.  Thus, the Court concludes that the Treasury's

3   ruling that Eisenhower's Book income would be taxed at a capital gains rate was

4   not related to or reflective of the Book's copyright status.

5

6        30.    This Court's conclusion is reinforced by the fact that the Book's

7   capital gains treatment is inconsistent with the Book *not* being a work for hire.

8   According to defendants, because the Book was *not* a work for hire, only

9   Eisenhower and/or his heirs had the right to the Book's renewal term.  However, as

10  described in the preceding Findings of Fact, the IRS conditioned capital gains

11  treatment of Eisenhower's Book income on Eisenhower "not retain[ing] any control

12  over the use of the completed manuscript."  Thus, Eisenhower had to and did

13  covenant in his closing agreement with the IRS that he had conveyed to Doubleday

14  "*forever* … all rights of every nature pertaining" to the Book.   But if Eisenhower

15  "forever" divorced himself of "all rights" in the Book in order to have his Book

16  income taxed as capital gains, he or his estate could not also own the Book's

17  renewal were the Book not a work for hire.  ~~Defendants cannot have it both ways.~~

18  Eisenhower could not have completely divested himself of a capital asset yet still

19  owned part of it (the renewal) at the same time.   Therefore, if property ownership

20  under tax and copyright law is treated as being the same, as defendants contend it

21  should be, capital gains treatment is not any more consistent with the Book *not*

22  being a work for hire than it is with the Book being a work for hire.   Accordingly,

23  the Court concludes that the Book's tax treatment is not probative of its copyright

24  status in this case, and defendants have failed to rebut the presumption under

25  copyright law that the Book is a work for hire.

26

27

28

LA2 650879 3

-32-
-AT-

## 2.    Eisenhower's Written Agreement With Doubleday

31.    Defendants contend that General Eisenhower's October 1, 1948 written agreement with Doubleday also rebuts the Book's presumptive work-for-hire status. According to defendants, the Book cannot be a work for hire because Eisenhower completed his manuscript months before they executed the agreement and thus, he, not Doubleday, was the Book's initial copyright owner.

32.    However, as described in the preceding Findings of Fact, the evidence shows that while Doubleday and Eisenhower delayed putting their understanding into writing until October 1, 1948 in order to comply with IRS formalities, the parties reached a binding oral agreement that Eisenhower would write the Book for Doubleday on December 30, 1947. *Canet v. Gooch Ware Travelstead*, 917 F. Supp. 969, 992 (E.D.N.Y. 1996); *In Re Frye,* 216 B.R. 166, 171 (Ed. D. Va. 1997).[2] Therefore, Doubleday was the copyright owner as work-for-hire proprietor.

33.    As described in the preceding Findings of Fact, the evidence shows that almost immediately after reaching their December 30, 1947 agreement, Doubleday and General Eisenhower each began performing their obligations, with both parties acting as if Doubleday owned the Book long before they executed the IRS-required paperwork in October 1948. ~~The Court does not believe that~~ Doubleday would not have embarked on its massive commitment of resources if it had not already possessed Book rights prior to putting its agreement with Eisenhower in writing on October 1, 1948. Nor would Eisenhower have spent countless hours working with Doubleday's editors, agreeing to assist in promotional efforts, and

---

[2] The Court does not need to resolve choice of law between New York (the state in which Doubleday performed the contract) and Virginia (the state in which parties reached the agreement and Eisenhower performed, i.e., wrote the Book.) because, to the extent the question is one of contract interpretation, both New York and Virginia enforce oral agreements.

1  writing the Book on an expedited basis at their expense unless he believed that he

2  and Doubleday had entered into a binding agreement with respect to the Book.

3

4      34.    The Court rejects defendants' contention that Doubleday had only an

5  "expectation" that it would publish the Book prior to the October 1, 1948 writing.

6  As described in the preceding Findings of Fact, the timing of Doubleday's written

7  agreement with Eisenhower was dictated by tax purposes. But for copyright

8  purposes, ~~the Court believes~~ the evidence shows that the parties intended to be

9  bound by their December 30, 1947 oral agreement, and acted in a manner consistent

10 with that intent.

11

12     35.    Although the October 1, 1948 agreement was phrased in terms of an

13 assignment, an assignment, "standing alone without any evidence as to the

14 circumstances or intendment of its execution," does not rebut the work-for-hire

15 presumption. *Lin-Brook*, 352 F.2d at 300 n.3; *Self-Realization*, 206 F.3d at 1328;

16 *Playboy Enterprises*, 53 F.3d at 556-57; *Niss*, 57 U.S.P.Q.2d at 1355 n.14.

17

18     36.    *Dolman*, 157 F.3d at 713, is distinguishable. In that case, the

19 assignment was only one of many factors contributing to the court's conclusion that

20 the songs were not works for hire: there was no evidence of "instance and

21 expense"; the employer renewed the songs' copyrights *in the composer's name*, the

22 employer contracted that if it did not promote the employee's songs, it would

23 assign them back on demand; and the employer had "no reason" to accept a

24 copyright assignment. *Id.* at 712-713. Here, in contrast, the Book was renewed in

25 Doubleday's name as work-for-hire proprietor, Eisenhower acknowledged that

26 Doubleday had "forever ... all rights of every nature" (Exh. 320-1), and the timing

27 and existence of the October 1, 1948 writing was dictated by the IRS, not copyright

28 considerations. Therefore, the Court concludes that the phrasing of the October 1,

1   1948 writing as an assignment does not negate the presumption that the Book is a

2   work for hire. *Hogarth*, 2002 WL 398696 at *23.

3

4                   3.      **Copyright Registrations To The Book And Other Works**

5        37.      Defendants contend that the Book's copyright registration, which

6   identifies Eisenhower as the Book's "author" and does not state that the Doubleday

7   is an "employer for hire," rebuts the Book's work-for-hire status.

8

9        38.      However, the Court concludes that both the Book's original and

10  renewal registrations are *consistent* with the Book being a work for hire. *Picture*

11  *Music*, 457 F.2d at 1214, 1217; *Hogarth*, 2002 WL 398696 at *18.  As described in

12  the preceding Findings of Fact, Doubleday listed itself as copyright *claimant*.

13  Furthermore, when Doubleday renewed the Book's copyright in 1975, more than

14  two decades before defendants questioned the validity of the Book's copyright, it

15  did so expressly as proprietor of a work for hire.   This was in stark contrast to

16  *The White House Years* and *At Ease*, which were *not* works for hire.  For those

17  books, Eisenhower was listed as the initial copyright claimant, and his family was

18  identified as the owner of the renewals.   (*At Ease* was renewed by operation of law.

19  17 U.S.C. §304(a).)

20

21       39.      While Section 209 of the 1909 Act provides that a registration may be

22  admitted as *prima facie* evidence of facts affirmatively stated therein, it does not

23  require a court to accept the registration as *prima facie* evidence of facts absent

24  from the registration.

25

26       40.      Because copyright registration applications are ministerial in nature,

27  and are often completed by non-lawyers who may be unaware of legal issues, the

28  descriptions (or lack thereof) on registrations are entitled to little or no weight in

LA2 650879.3

-35-
-50-

1 ˙determining work-for-hire status. *Craft v. Kobler*, 667 F.Supp. 120, 125 (S.D.N.Y.

2 1987); *Frost Belt International Recording v. Cold Chillin' Records*, 758 F. Supp.

3 131, 137 n.12 (S.D.N.Y. 1990); *Urantia Foundation v. Maaherra*, 114 F.3d 955,

4 961-63 (9th Cir. 1997).

5

6     41.    Based on Doubleday's practices and the law, the Court concludes that

7 whether or not Doubleday identified the Book as a work for hire in the original

8 registration has no probative value. Accordingly, the registrations for the Book and

9 other works do not rebut the Book's work-for-hire status.

10

11     **C.**    **The Parties Believed The Book Is A Work For Hire**

12     42.    The Court finds that the Book's work-for-hire status is corroborated by

13 the principals' expressions about who owned the book's initial and renewal

14 copyrights. *Muller v. Walt Disney*, 871 F.Supp. 678, 685 (S.D.N.Y. 1994); *Lin-*

15 *Brook*, 352 F.2d at 300 n.3. As described in the preceding Findings of Fact,

16 Doubleday and General Eisenhower's family always have expressed the belief

17 and/or acted in a manner consistent with Doubleday owning the Book's renewal

18 rights as work-for-hire proprietor.

19

20     **D.**    **The Proprietor Has The Right To Renew The Copyright To A**
            **Work For Hire That Is Authored By An Independent Contractor**

21

22     43.    Defendants *contend* that even if the Book were a work for hire, Doubleday's

23 renewal was invalid because the 1909 Act's grant of renewal rights to proprietors of

24 works for hire applied only to works prepared for traditional employers, not

25 commissioning parties like Doubleday. The Court, however, finds that the law

26 does not support defendants' contention.

27

28

1    44.    The 1909 Act's renewal provision does not distinguish between works

2    for hire created in the scope of regular employment and those specially

3    commissioned.    Section 24 of the 1909 Act states: "[I]n the case of . . . any work

4    copyrighted by . . . an employer for whom such work is made for hire, the

5    proprietor of such copyright shall be entitled to a renewal and extension of the

6    copyright in such work . . . ."  17 U.S.C. §24 (1909).

7

8    45.    Virtually every court has interpreted Section 24 as applying to both

9    traditional employers and independent contractors and thus has expressly or

10   impliedly ruled that the commissioning party rather than the independent contractor

11   has the right to renew a work for hire.  *See, e.g., Picture Music*, 457 F.2d at 1217;

12   *Real Estate Data, Inc. v. Sidwell Co.*, 907 F.2d 770, 773 (7th Cir. 1990), *cert.*

13   *denied*, 498 U.S. 1088 (1991); *National Center for Jewish Film, Inc. v. Goldman*,

14   943 F.Supp. 113, 116-118 (D.Mass. 1996); *Self-Realization*, 206 F.3d at 1326;

15   *Philadelphia Orchestra*, 821 F.Supp. at 347-49; *Muller*, 871 F.Supp. at 684-85

16   (same, as to Orchestra conductor); *Faulkner v. National Geographic Society*, 211

17   F.Supp.2d 450, 465 (S.D.N.Y. 2002); *Hogarth*, 2002 WL 398696 at *18-24;

18   *Urantia*, 114 F.3d at 961.[3]

19

20   46.    *Eliscu v. T.B. Harms Co.*, 151 U.S.P.Q. 603, 604 (N.Y. Sup. Ct. 1966),

21   does not hold to the contrary, because the court in that case took pains to note that

22   the lyricist claiming renewal rights was "neither an employee, *nor* truly an

23   independent contractor."

24

25   [3] The *Hogarth* and *Urantia* cases are probative of the commissioning party's ownership of
     renewal rights to works for hire under the 1909 Act, despite the fact that the works at issue

26   were renewed under Section 304(a) of the 1976 Act.  While the 1976 Act *generally*
     constitutes a "radical break from 'work for hire' doctrine under the 1909 Act," *Easter*

27   *Seal*, 815 F.2d at 335, Congress expressly made clear that "[s]ubsection (a) of section 304
     reenacts and preserves the renewal provision, now in section 24 of the statute, for all of

28   the works presently in their first 28-year term." H.R. Report No. 94, p. 139 (1976), U.S.
     Code Cong. & Admin. News 1976, p. 5755.

1      47.    *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 31 (2d Cir. 1939), *cert.*

2  *denied*, 309 U.S. 686 (1940), and *Shapiro, Bernstein & Co. v. Jerry Vogel Music*

3  *Co.*, 221 F.2d 569 (2d Cir. 1955) similarly are inapposite because work-for-hire

4  status in those cases was based on the outmoded theory of implied assignment

5  rather than the now-applicable presumption of statutory authorship in the party at

6  whose "instance and expense" the work is created.  Starting with *Brattleboro*

7  *Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 568 (2nd Cir. 1966),

8  work-for-hire law "gradually expanded [from a theory of implied assignment] into a

9  presumption that *anyone* who paid an artist to create a copyrightable work was the

10  *statutory author* under the work for hire doctrine." *Dumas v. Gommerman*, 865

11  F.2d 1093, 1096 (9th Cir. 1989) (emphasis added). *See also Easter Seal*, 815 F.2d

12  326-27 (recognizing that beginning with *Brattleboro*, courts adopted rule that

13  "whoever commissioned a work was presumed the statutory 'author'").  In light of

14  the common law's evolution, courts and commentators have expressly rejected any

15  reliance on *Yardley* and *Shapiro* in interpreting the 1909 Act's work-for-hire

16  provisions. *See, e.g., Easter Seal Society*, 815 F.2d at 330 n.13 ("[I]n Nimmer's

17  view there was a distinction in the case law under the 1909 Act between

18  'employees' . . . and independent contractors.  Independent contractors . . . were

19  only 'presumed' to have assigned the copyrights in the work. . . . With all respect,

20  we think the distinction urged by Professor Nimmer was erased long before the

21  1976 Act's arrival.  The whole point of *Brattleboro Publishing* was to . . . make an

22  independent contractor . . . into a copyright 'employee' so that the buyer was the

23  'author.'  That point was made over and over again. . . .  Professor Nimmer's

24  distinction between 'employment' and 'commissioned works' in the case law is

25  invisible to us."); Angel & Tannenbaum, *Works Made for Hire Under S.22*, 22

26  N.Y.L. Sch. L. Rev. 209, 213-14 (1976) (*Picture Music* "has been criticized [by

27  Nimmer] as appearing to be wrong . . . .  However, *Picture Music* has been cited

28  with approval in [subsequent decisions]")  With the commissioning party now

1  ᐧconsidered to be the presumptive author and copyright owner of a work for hire

2  from inception, there is no assignment to revert to the independent contractor upon

3  the work's renewal. Thus, as described in Conclusion of Law No. 45, all of the

4  decisions since *Brattleboro* have found that *the commissioning party* owns the right

5  to renew under Section 24 of the 1909 Act, not the independent contractor.

6

7       48.    The Court believes *Royalty Control Corp. v. Sanco, Inc.*, 175 U.S.P.Q.

8  641 (N.D.Cal. 1972), the only case the Court could find to the contrary, is an

9  anomaly. The *Royalty Control* court simply may have been unaware of *Picture*

10  *Music*, which had been decided only two months beforehand.  *Cleary v. News*

11  *Corp.*, 30 F.3d 1255, 1259 n.3 (9th Cir. 1994), also briefly touched upon the

12  assignment theory in *dictum* that had nothing to do with the renewal of works for

13  hire.

14

15      49.    The Court finds that defendants' reliance on *CCNV*, 490 U.S. at 730, is

16  misplaced. *CCNV* concerns the scope of Section 101 of the 1976 Act. Defendants

17  contend that because "employee" refers to a formal employee under the 1976 Act,

18  as interpreted by the Supreme Court in *CCNV*, the word "employer" in Section 24

19  of the 1909 also must refer only to the master servant-relationship. The Court,

20  however, rejects defendants' attempt to equate the work-for-hire provisions of the

21  1976 and 1909 Acts.

22

23      50.    First, in enacting Section 101 of the 1976 Act, "Congress did not

24  intend a continuation of the status quo." *Gommerman*, 865 F.2d at 1097. "The

25  1976 Act was a "radical . . . departure from prior law." *Id.; Easter Seal*, 815 F.2d at

26  335. "Where the drafters of the 1976 Act intended to include existing law, they

27  stated that intention clearly." *Gommerman*, 865 F.2d at 1102. While they did so

28  with respect to Section 304(a), the 1976 Act's renewal provision, Congress did not

1    do so with respect to Section 101. Accordingly, the Court finds that the *CCNV*

2    court's interpretation of Section 101 of the 1976 Act does not shine light on the

3    meaning of Section 24 of the 1909 Act.

4

5         51.    Second, ascribing the narrow definition of "employee" in Section

6    101(1) of the 1976 Act to Section 24 of the 1909 Act is inconsistent with the

7    common law's now uniform application of Section 26, which like Section 24, refers

8    to a work-for-hire "employer." Courts -- *including in decisions subsequent to*

9    *CCNV* -- uniformly have come to hold that Section 26 applies equally to traditional

10   employers *and* commissioning parties and, thus, that commissioning parties

11   initially own the copyrights to works created for them by independent contractors.

12   *See, e.g., Self-Realization*, 206 F.3d at 1326; *Playboy Enterprises*, 53 F.3d at 554;

13   *Marvel*, 254 B.R. at 828 ; *Niss*, 57 U.S.P.Q.2d at 1353. ~~The Court does not believe~~

14   ~~It~~ *is not* ̂reasonable to interpret "employer" as encompassing commissioning parties for

15   purposes of Section 26, but only traditional employers under Section 24.

16   Therefore, the Court concludes the *CCNV* court's ruling on the scope of Section

17   101 of the 1976 Act is not probative of the scope of the renewal provision under the

18   1909 Act.

19

20        52.    In sum, defendants' attempt to import into the renewal provision of the

21   1909 Act the dichotomy between works created for traditional employers and those

22   prepared for commissioning parties set forth in Section 101 of the 1976 Act is not

23   supported by the language of Section 24 or the common law. Since the expansion

24   of the work-for-hire doctrine to make commissioning parties the initial copyright

25   owners of works for hire, the case law almost uniformly holds that the

26   commissioning party also owns the renewal term. The Court refuses defendants'

27   invitation to take the unprecedented step and be the first modern-day court to hold

28   to the contrary.

1    **E.    The Book's Work-For-Hire Status Is Constitutional**

2    53.    The Court also rejects defendants' invitation to be the first court to rule

3    that the application of the work-for-hire doctrine to commissioning parties like

4    Doubleday is unconstitutional. ~~The Court believes that~~ the policy underlying the

5    Copyright Clause -- providing a financial incentive for the initiation and funding of

6    artistic activity, *Mazer v. Stein*, 347 U.S. 201, 219 (1954); *Goldstein v. California*,

7    412 U.S. 546, 555 (1973) -- applies to work-for-hire proprietors like Doubleday,

8    who motivate the existence of and pay for the creation of works for hire.

9

10    **V.    CONCLUSION**

11    54.    In light of the Court's finding that the Book is a work for hire, the

12    Court concludes that the copyright to the Book was properly renewed by its

13    proprietor, Doubleday, and the Book remains protected by copyright. *Because* ~~Given that~~

14    the Court previously determined as a matter of law that plaintiffs owned chain of

15    title to the Book and that defendants admitted copying substantial portions of the

16    Book to create *Campaigns* (findings that defendants did not appeal to the Ninth

17    Circuit), the Court concludes that plaintiffs have proven all of the elements of their

18    cause of action for copyright infringement. Plaintiffs are instructed to prepare a

19    Judgment for the Court's signature within ten (10) days of the issuance of this

20    Order.

21

22

23

24

25

26

27

28

LA2 650879 3

-41-
-56-

55.    Purusuant to Fed. R. Civ. P. 54(d), plaintiffs may file a motion for the attorney's fees and costs incurred since the Ninth Circuit's remand, which will supplement the Court's prior award of attoreny's fees on November 28, 2000.

DATED this 30th day of December 2002.

FLORENCE-MARIE COOPER
United State District Court Judge